MUNICIPALITY OF ANCHORAGE and
Marc Woodward, Appellants/Cross–
Appellees,

v.

Theresa A. (Wimer) GREGG,
Appellee/Cross–
Appellant.

Nos. S–10722, S–10751.

Supreme Court of Alaska.

Nov. 12, 2004.

Linda J. Johnson, Deputy Municipal Attorney, and William A. Greene, Municipal Attorney, Anchorage, for Appellants/Cross–Appellees.

Kenneth W. Legacki, Anchorage, for Appellee/Cross–Appellant.

Jonathan P. Meier, Sirianni Youtz Meier & Spoonemore, Seattle, for Amici Curiae Northwest Women's Law Center and Alaska Network on Domestic Violence and Sexual Assault.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

BRYNER, Chief Justice.

## I. INTRODUCTION

Theresa Gregg sued the Municipality of Anchorage and her supervisor, Sgt. Marc Woodward, for violating her right to protected leave under the Family and Medical Leave Act (FMLA). In a bench trial, the superior court found that the Municipality had violated the Act by refusing Gregg leave while she was incapacitated by a "serious health condition": the combined effect of her pregnancy, injuries from a car accident, and severe emotional stress. The Municipality appeals, disputing Gregg's qualification for the FMLA's protection, the factual findings of the trial court, and its award of damages. Gregg cross-appeals that she was improperly denied liquidated damages. Both parties assert that the court's calculation of interest on Gregg's award was erroneous. We affirm the trial court's judgment that the Municipality violated Gregg's right to protected leave under the Act, correct two errors in the court's calculation of damages, and remand for reconsideration of the award of prejudgment and postjudgment interest and liquidated damages.

## II. FACTS AND PROCEEDINGS

In this case the superior court made extensive findings of fact. The thrust of the Municipality's appeal is that some of these findings are in error and cannot support the trial court's decision. We summarize the record and the court's findings as follows.

The Anchorage Police Department (APD) hired Theresa Gregg (formerly Wimer) in March of 1995. In late 1996 Gregg transferred to the APD's warrant section, where her supervisor was Sgt. Marc Woodward. Gregg's employment record was excellent, and she was held in high regard by her fellow officers.

In January 1997 Gregg was involved in a car accident. At the time of this accident, Gregg was married to Michael Wimer but was approximately two-and-a-half months pregnant with a child by her current husband, APD officer Jeffery Gregg. On January 10, Woodward placed Gregg on sick leave status because of her car accident injuries.

During this leave, Gregg's husband, Michael Wimer, an Army JAG officer, was arrested for threatening to kill Jeffery Gregg. The trial court summarized the events leading to Wimer's arrest as follows:

Theresa was married to Michael Wimer and they had two minor children.... Theresa described her marriage to Michael as an unhappy marriage. It involved domestic violence where Michael was mentally abusive and exercised extreme control over all facets of her life. Theresa became involved in an extra-marital affair with another police officer, Jeffery Gregg, with whom she became pregnant. When Michael discovered that Theresa was pregnant with Gregg's child, he called Gregg and threatened him. Gregg filed a criminal complaint against Wimer and an arrest warrant was issued. Theresa felt that she was in a hostage situation with Michael and cooperated with APD to get Michael in a "disadvantaged situation" in a public place for the arrest to take place. The arrest took place at the Buckner Field House at Fort Richardson military base.

The parties stipulated that during January, three different health care providers treated Gregg. Dr. Cynthia Brooke examined Gregg for her pregnancy, and in a letter dated January 14, requested that "lighter duties be assigned to [Gregg] for the remainder of her pregnancy." Dr. Ronald Firth examined her

accident injuries and released her back to full, unrestricted duties as of January 27. Gregg was still suffering pain from her accident injuries and saw Dr. Firth again on January 28. On this visit she also discussed the stress of her marriage. Dr. Firth prescribed her Valium. Although she was technically released back to work, Gregg did not return to the department and remained on paid sick leave. The trial court found that "[t]he two work releases Theresa received were related only to the injuries sustained in the car accident and to her pregnancy. The work releases did not address ... the psychological stress she was suffering as a result of the domestic violence and subsequent arrest of her husband."

Gregg and Woodward discussed her leaving the state while she was on sick leave. Woodward was concerned about Gregg's domestic situation. Before Wimer's arrest, Woodward reported his fear that Gregg was at risk of harm from domestic violence. After Wimer's arrest, APD Captain William Miller suggested to Gregg that she go somewhere she felt safe.

Wimer was arraigned on February 5. Gregg was present at the arraignment. At the arraignment, Wimer stated that he was "getting ready [for a permanent change of station] within a couple weeks." Gregg also told the court that "[w]e're moving," and she agreed to be Wimer's third party custodian.

On February 5, Woodward wrote a memo to Captain Bruce Richter explaining that "[Gregg] wants to go to her mother['']s in Florida with her kids to work things out. She is still on sick leave and is planning to see a doctor there to continue treatment." Captain Richter approved Gregg's request.

Gregg left Alaska for Florida. Wimer followed her, and eventually obtained a transfer to Virginia. The couple unsuccessfully attempted a reconciliation. At some point, Jeffery Gregg went to Virginia, endeavoring to bring Theresa Gregg back to Alaska. This led to a physical confrontation between Jeffery Gregg and Michael Wimer. Jeffery Gregg returned to Alaska without Theresa.

From February until the end of March, Gregg was in regular contact with the department through Woodward. On March 3, 1997, Woodward changed Gregg's leave status from sick leave to annual leave when he learned that she was medically released back to work. Gregg intended to return to her job, and she requested to be placed on leave without pay status in order to resolve "her personal issues." Woodward told her that the department had denied her request.

At trial, the command staff above Woodward denied knowledge of Gregg's request for leave without pay. Under the department's policies, a supervisor must inform an officer who makes an oral request for leave without pay that such requests are to be made in writing to the chief of police. Woodward never told Gregg that she needed to file a written request. Although aware that Gregg was in need of "mental help" at this time—and knowing that she had begun her leave suffering from injuries, pregnancy, and tremendous domestic stress—Woodward also failed to inform Gregg of her rights to leave under the state and federal family and medical leave acts. In fact at no time, before or after Gregg's pregnancy, accident, and request to leave the state, did anyone from the APD tell Gregg of her right to statutory leave.

On April 11, a Friday, Woodward told Gregg, who was apparently still in Florida, that she must return to work on Monday or be terminated for abandoning her position. Gregg asked for more time to "get her life together, to address her financial situation that needed to be put in order, to deal with her pregnancy, to protect her children, to deal with her injuries ... all these things." For the second time she asked for leave without pay, but Woodward told her that this request had been denied.

Gregg knew that termination would threaten her officer certification, which would in turn harm her chances of rehire with the department. On the day of her conversation with Woodward, Michael Wimer faxed a copy of Gregg's signed resignation to the department. Within days, Gregg called Woodward to cancel her resignation, but he refused.

Gregg's resignation terminated her employment with the department effective April 11. Department personnel director Wray

Kinard indicated on Gregg's personnel action form that Gregg was eligible for rehire. On a second personnel action form, filed May 6, 1997, Kinard changed Gregg's rehire recommendation to a negative. In a note attached to the form, Kinard stated, "[Gregg] left the state without notification or coordination with APD. She resigned by FAX transmission." Kinard's negative recommendation was based on information provided by Woodward, which the court found to be "factually incomplete and inaccurate in many significant regards."

After Gregg returned to Anchorage in August 1997, she twice applied for rehire with the department. The department denied Gregg's applications because of Woodward's criticism.

On January 22, 1999, Gregg sued Woodward and the Municipality alleging, among other claims, that the Municipality had wrongfully terminated her and violated the Family and Medical Leave Act. In a bench trial before Judge Rene Gonzalez in July of 2001, the superior court found that the Municipality had violated Gregg's FMLA rights and wrongfully terminated her. The court awarded Gregg economic losses of $628,706.27, but found that liquidated damages were unwarranted. The Municipality appeals, and Gregg cross-appeals.

## III. DISCUSSION

### A. The Municipality's Appeal

The Municipality argues that the court erred in finding that it violated the FMLA because Gregg did not suffer from a serious health condition or undergo continuing treatment as defined in the Act; because she

failed to give notice as the Act requires; and because the APD had already given her leave equivalent to the amount the Act would have granted her. The Municipality also contends that the court erred in finding that it wrongfully terminated Gregg, and in finding Gregg's testimony credible. Finally, the Municipality argues that the court erred in its calculation of damages and in its award of postjudgment interest.

### 1. Standard of review

■■■ To the extent that the trial court's decision relied on findings of fact, we review under the clearly erroneous standard.[1] Under this standard we reverse only when we are left with a "definite and firm conviction that a mistake has been made."[2] Therefore, we must " 'take the view of the evidence most favorable to the prevailing party below,' and give due regard to 'the trial court's opportunity to judge the credibility of the witnesses.' "[3]

■■■ We review questions of law de novo.[4] A claim under the FMLA involves an objective test of the plaintiff's incapacity, which, if heard by a fact-finder, presents mixed questions of law and fact.[5]

### 2. Family and Medical Leave Act

Under the FMLA,[6] an employee is entitled to "12 workweeks of leave during any 12–month period" for childbirth or adoption; to care for a close relative with a serious health condition; or if the employee is unable to perform work-related duties due to a serious health condition.[7] The Act makes it unlawful

---

1. *Am. Computer Inst., Inc. v. State*, 995 P.2d 647, 651 (Alaska 2000).

2. *Id.*

3. *Id.* (quoting *Graham v. Rockman*, 504 P.2d 1351, 1353–54 (Alaska 1972); *Voss v. Brooks*, 907 P.2d 465, 467 (Alaska 1995)).

4. *Wasserman v. Bartholomew*, 38 P.3d 1162, 1169 (Alaska 2002).

5. See *Thorson v. Gemini, Inc.*, 205 F.3d 370, 377 (8th Cir.2000).

6. 29 U.S.C. §§ 2601–2654. Gregg brought her claim under the federal act and similar provi-

sions of the Alaska Family Leave Act, AS 39.20.500–.550, and Anchorage Municipal Code 3.30.1515. We address only the FMLA because the Alaska Act and municipal code do not provide a remedy. *See* AS 39.20.540.

7. 29 U.S.C. § 2612(a)(1) provides:

Subject to section 2613 of this title, an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12–month period for one or more of the following:
(A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter. (B) Because of the placement of a son or daughter with the employee for adoption or foster care. (C) In order to

"for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" the Act provides.[8]

The superior court found that Gregg was entitled to FMLA leave because she suffered from a "serious health condition that made her unable to perform the functions of a police officer." Regulations implementing the Act define a "serious health condition" as a period of incapacity of at least four consecutive days that also involves continuing treatment by a health care provider.[9] They further define "incapacity" as an "inability to work, attend school or perform other regular daily activities."[10] A plaintiff shows that he or she underwent "continuing treatment" by evidence that the plaintiff sought treatment two or more times from a health care provider.[11] In short, the federal regulation allows an employee to claim protection under the Act when she is able to show that she had a period of incapacity that lasted four or more days and involved at least two treatments from a health care provider.[12]

### a. Incapacitation due to a serious health condition

█ To claim the protection of the FMLA, Gregg had first to demonstrate that she was incapacitated for four or more days and unable to perform the essential functions of her employment.[13] It is evident from its decision that the court found Gregg was incapacitated by multiple health conditions from January until April 11, 1997. The superior court found that when Gregg requested leave without pay on April 11, she was "clearly suffering from the cumulative effect of several health and mental conditions that constituted a serious health condition that made her unable to perform the functions of a police officer." These included the facts that "[s]he was pregnant, she was recovering from injuries sustained in an automobile accident and she was going through significant mental stress. She was a victim of domestic violence and she needed time to deal with her personal issues."

█ The court specifically found that testimony by Gregg's expert, Dr. Cynthia Dodge, who retroactively diagnosed that Gregg had suffered from post traumatic stress disorder from January to July 1997, had the "strong ring of truth." Dr. Dodge based her conclusion on the "traumatic event[s]" of domestic violence that Gregg suffered in January of that year. Dr. Dodge explained that the symptoms of "nightmare[s] ... intrusive memories ... high levels of anxiety to the point of sleeplessness ... confusion, feeling overwhelmed and dis-

care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition. (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

8. 29 U.S.C. § 2615.

9. According to 29 C.F.R. § 825.114(a), "serious health condition" entitling an employee to FMLA leave means an illness, injury ... or mental condition that involves:
....
(2) Continuing treatment by a health care provider. A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:
(i) A period of incapacity (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

(A) Treatment two or more times by a health care provider....

10. 29 C.F.R. § 825.114(a)(2)(i).

11. *Id.*

12. *See Thorson,* 205 F.3d at 377. The regulation sets out several alternative definitions of "serious health condition," that trigger benefits, including a "chronic serious health condition." *See* 29 C.F.R. § 825.114. Gregg and Amici Northwest Women's Law Center and Alaska Network on Domestic Violence & Sexual Assault argue that the judgment in favor of Gregg could be affirmed on alternative grounds because she suffered from a "chronic serious health condition." Because we affirm the finding of the trial court, it is unnecessary for us to determine whether Gregg's condition met the regulatory definition of "chronic" as well.

13. 29 C.F.R. § 825.114(a); *Frazier v. Iowa Beef Processors, Inc.,* 200 F.3d 1190, 1195 (8th Cir. 2000) ("[A]n inability to perform one's job is a requisite element of a FMLA claim....").

tressed, and a hypervigilance" that Gregg reported were all consistent with a diagnosis of post traumatic stress disorder. The doctor further concluded that Gregg's accident injuries and pregnancy contributed to this condition.[14]

Dr. Dodge's testimony is the only medical evidence that Gregg suffered from an incapacitating health condition in April 1997. The parties stipulated that Gregg did not receive treatment from a health provider in April—for either her accident injuries or emotional distress—and Gregg presented no evidence at trial to show whether or not she received care related to her pregnancy at that time. It is undisputed that the health professionals that Gregg saw in January released her back to her duties.

The Municipality disputes the court's conclusion on two levels. First, it argues that, as a matter of law, Gregg cannot establish that she was incapacitated in April, when she requested further leave, because she did not obtain a contemporaneous medical provider's diagnosis that she was unable to work. Secondly, it argues that Dr. Dodge's testimony is not credible, and that therefore the trial court's finding is without basis.

Based upon its reading of federal precedent, the Municipality argues that the FMLA requires a contemporaneous diagnosis of the employee's incapacity by a health care provider. It notes that Gregg was, at the time of her request for leave, technically released back to work. And it points to the fact that

Gregg saw no additional doctors in April to establish that she was not entitled to the Act's protection at that time.

It is true that federal courts generally require that a plaintiff base proof of an FMLA claim on a health care provider's diagnosis, at some point, that "the employee *cannot* work (or could not have worked) *because of* the illness."[15] But we do not read this precedent as substituting the opinion of on-the-scene medical professionals for the ultimate judgment of the fact-finder. For one thing, an employee could, as in this case, suffer from a condition, such as post traumatic stress disorder, which is not immediately capable of diagnosis by a non-specialist. When an employee is actually incapacitated by illness, the failure to get a correct diagnosis cannot disqualify an employee from the Act's protection. To hold that a doctor must agree, contemporaneously and at all times, that the employee is unable to work, places a burden on the employee that we find nowhere in the plain text of the Act, and ignores the reality of debilitating illness.

Instead, the Act allows an employer to request a contemporary diagnosis at the time it grants FMLA leave; a safeguard that balances the rights of employer and employed.[16] The Municipality did not do so.[17] While this does not obviate the requirement that Gregg show that a medical professional considered her to be incapacitated, there was substantial evidence in the record in addition to Dr. Dodge's testimony that corroborates

14. Mental illness or a high level of emotional stress may incapacitate an employee for purposes of the FMLA. *See, e.g., Stubl v. T.A. Sys., Inc.*, 984 F.Supp. 1075 (E.D.Mich.1997) (finding that plaintiff qualified for FMLA protection due to "prolonged grief reaction," as diagnosed by physician). And multiple adverse health conditions, perhaps minor in isolation, may collectively incapacitate an employee for purposes of the Act. *Price v. City of Fort Wayne*, 117 F.3d 1022, 1024–25 (7th Cir.1997).

15. *See, e.g., Olsen v. Ohio Edison Co.*, 979 F.Supp. 1159, 1166 (N.D.Ohio 1997). *But cf. Marchisheck v. San Mateo County*, 199 F.3d 1068, 1074 (9th Cir.1999) (finding plaintiff's son's personal allegations that he could not do "anything" for four or five days following a beating sufficient to create a dispute of fact on whether son was incapacitated).

16. 29 U.S.C. § 2613(a).

17. The Municipality was aware that Gregg was medically released back to work when it changed her leave status from sick to annual, yet the court found that any reasonable observer, including officers at the department who knew that Gregg was a victim of domestic violence, would have seen that Gregg was under "significant mental stress." Under the Act, it was therefore the Municipality's responsibility to apprise her of her rights to further leave under the Act, and, if the Municipality suspected her of malingering, to require a health care provider to certify her condition. At least one circuit court has held that an employer's failure to require certification meant that there could be no genuine issue of fact as to whether the plaintiff was incapacitated. *See Thorson*, 205 F.3d at 381.

the conclusion that Gregg was incapacitated.[18] Once the trial court accepts evidence of a medical professional, in this case Dr. Dodge, that the plaintiff was incapacitated, that finding is protected by the clearly erroneous standard.[19]

■ The Municipality also argues that the fact that health care providers she saw in January actually released Gregg back to work should bar her claims of incapacity in April. While the health care providers that Gregg saw in January 1997 released her back to work, the court found that—possibly due to the narrow focus of their examinations—they did not fully diagnose her combination of debilitating health conditions. In fact, they were unable to determine the extent of even her knee injuries because she could not be x-rayed while she was pregnant. The court found that Gregg continued to suffer pain from her accident injuries, and neither release adequately addressed her psychological stress. We conclude from these findings that in the course of Gregg's visits to health care providers in January, the extent of her incapacity was never fully diagnosed, and, therefore, the partial releases do not bar her claim.

■ The Municipality also disputes the factual basis of the court's decision. It asserts that Dr. Dodge's testimony was not credible because her diagnosis was retroactive; because it did not definitely establish that Gregg was incapacitated for three or more days in April; and because Dr. Dodge "did not know what the functions of the job of a police officer at APD were . . . [she] therefore could not and did not render an opinion of whether [Gregg's] alleged post traumatic stress disorder would have prevented her from performing the functions of her police officer job." The Municipality also notes that Dr. Dodge concurred that malingering should be suspected when a litigant

seeks a post traumatic stress diagnosis. We address each of these concerns with Dr. Dodge's testimony in turn.

While courts have rejected retroactive diagnoses, it is generally for other evidentiary reasons, such as when the diagnosis was also speculative or given without actually examining the patient.[20] The cases cited by the Municipality do not hold that retroactive medical diagnoses may never establish an FMLA claim. Here, the superior court was in the best position to weigh Dr. Dodge's retroactive diagnosis, subject to the rules of evidence, and concluded that her opinion was credible. We will not second guess the credibility of a witness on review.

The Municipality also argues that Dr. Dodge's testimony did not establish that Gregg suffered from a "period of incapacity" in April because Dr. Dodge "did not know when the post traumatic stress disorder began nor when it ended, and so could not have testified that a definite period of incapacity existed." The Municipality is correct that Dr. Dodge could not determine the exact date when Gregg's mental and emotional stress became incapacitating. But Dr. Dodge did state that it was her opinion that Gregg suffered the symptoms of a stress disorder from January to July 1997. In this bench trial, it was the court's role to determine if this broad diagnosis, together with the other facts of the record, reasonably established that in April Gregg was incapacitated for three or more days.

■ Finally, the Municipality asserts that Dr. Dodge was not qualified to decide if Gregg was unable to perform the duties of a police officer. Dr. Dodge admitted that she did not know the basic qualifications of a police officer, but she also testified that, in her opinion, a person suffering from post traumatic stress disorder would not be competent for police work because of the "high

---

**18.** See *Thorson,* 205 F.3d at 377 ("Once the factfinder has affirmatively found the necessary facts, the conclusion that a plaintiff had a 'serious health condition' is inescapable as a matter of law.").

**19.** *But cf. Frazier,* 200 F.3d at 1195 (holding that judgment as matter of law was appropriate against employee's FMLA claim when employee

failed to provide any medical evidence he was incapacitated).

**20.** See, e.g., *Joslin v. Rockwell Int'l Corp.,* 8 F.Supp.2d 1158 (N.D.Iowa 1998) (doctor who provided retroactive excuse never examined plaintiff); *Bond v. Abbott Labs.,* 7 F.Supp.2d 967, 976 (N.D.Ohio 1998).

level of symptoms." What Dr. Dodge's testimony lacked in precision on this point is supplied by other non-medical evidence in the record.

Beyond Dr. Dodge's diagnosis, the facts as found by the trial court support its conclusion that Gregg was incapacitated. Significantly, Woodward, Gregg's immediate supervisor and the only department officer reviewing her case, admitted in testimony that Gregg might have required a "psych evaluation" before she could return to work to see if her emotional stress was affecting her judgment. The Municipality as much as admits this in its brief when it states, "Based on what he had seen of [Gregg's] behavior, Woodward believed that she should have been assessed for judgment issues. Judgment is a key concern for police officers." Gregg did testify that she continued to suffer from pain from her accident injuries and saw a specialist in October 1997, when she could be x-rayed after the birth of her child. And the fact that Gregg was in an abusive domestic relationship is relevant. A reasonable person could conclude that Gregg was effectively unable to work because she fled the state to leave an abusive husband who followed her, and that she was unable to perform daily activities because she was held in a "hostage situation," where her behavior was dictated by the combination of fear for her children, a high level of emotional stress, her accident injuries, and her pregnancy.[21]

### b. Continuing treatment

██ To earn the protection of the FMLA for a serious health condition, a plaintiff must also establish that her period of incapacity involved treatment two or more times by a health care provider.[22] The Eighth Circuit has observed that this reflects "the [Department of Labor's] decision that 'serious health condition' should be defined by an objective test that could be applied consistently based on the facts of each case."[23] The superior court found that Gregg had satisfied this requirement because she visited three medical providers for treatment of her accident injuries and pregnancy in January 1997.

The Municipality maintains that the superior court erred in relying on this period of treatment because these providers released Gregg back to light duty at the end of January. It contends that Gregg would have to show that she received treatment in April when her request for further leave was denied, to qualify for further FMLA leave.

The Municipality's first argument would read into the regulations a requirement that the length of an employee's leave should be determined by a medical professional, rather than decided as an accommodation between employer and employee. The purpose of the second regulatory factor is verification. It simply requires that the employee's "serious health condition" be serious enough to require two or more visits to a health care provider.[24] Such is the objective test.[25] The Act then entitles the employee to leave for "any subsequent treatment or period of incapacity relating to the same condition."[26]

The plain text of the regulation proves that it was unnecessary for Gregg to seek further treatment in April and yet still claim the Act's protection. Gregg saw three health providers in January. The court found that she was still suffering pain from the car accident after her visits, and that these trips to the doctors did not address the complete extent of her psychological stress. Gregg testified that she discussed the stress of her marriage with at least one of them, who prescribed Valium to Gregg according to his medical records. Thus, we may reasonably

---

**21.** This is not to say that a victim of domestic violence is automatically entitled to the protection of the FMLA. But any victim of domestic violence who meets the tests for a "serious health condition," as Gregg did, certainly has a right to statutory leave.

**22.** 29 C.F.R. § 825.114(a)(2)(i)(A) & (B); *see, e.g., Rankin v. Seagate Techs., Inc.,* 246 F.3d 1145, 1148 (8th Cir.2001); *Thorson,* 205 F.3d at 377;

*Martyszenko v. Safeway, Inc.,* 120 F.3d 120, 122–23 (8th Cir.1997).

**23.** *Thorson,* 205 F.3d at 376.

**24.** 29 C.F.R. § 825.114(a)(2).

**25.** *Thorson,* 205 F.3d at 378.

**26.** 29 C.F.R. § 825.114(a)(2)(i).

conclude that Gregg first qualified for FMLA leave in January, and since the trial court found that the same health conditions that caused her to seek treatment in January persisted through April, Gregg suffered through April a "period of incapacity relating to the same conditions" sufficient to satisfy the plain text of the regulation.[27]

### c. Notice requirement

To invoke the protection of the FMLA, an employee must notify his or her employer of her intention to take leave.[28] The requirements of this rule are flexible. If the employee's need for FMLA leave is based on foreseeable events or treatment, thirty days notice must be given to the employer.[29] Otherwise, the employee should give notice as soon as is practicable.[30] When the need for leave is unforeseeable, the "employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed."[31] Under this standard, whether an employee has given adequate notice will depend on the facts and circumstances of each case.[32] "The critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition."[33] Accordingly, the test of whether or not an employee has given adequate notice is a factual one that we review for clear error.[34]

The Municipality argues that Gregg failed to give sufficient notice because she stated only that she needed time to "get her life back together" on April 11 when she requested leave without pay. It asserts that Gregg, at a minimum, needed to alert Wood-

ward of her need for medical treatment or another "qualifying reason" under the FMLA.

The trial court found that Gregg gave proper notice, although she did not expressly invoke the FMLA. The record supports this conclusion. The Municipality placed Gregg on sick leave initially and, although her status changed to annual leave in March, the department never alerted her to her rights under the FMLA. Woodward was in weekly contact with Gregg and was aware of her injuries and domestic situation. The court found Gregg's testimony was credible that she informed Woodward on April 11 that she needed more time to deal with her injuries. It concluded that "any reasonable person would have seen ... the significant mental stress [Gregg] was suffering from during the relevant times in this case." But neither Woodward nor the responsible department officer, Kinard, alerted Gregg to her rights under the FMLA or considered how the Act might grant her protected leave for her incapacity.

The court reasonably determined that Gregg could not foresee her need for further leave on April 11. Gregg was in a stressful domestic situation, she had left Alaska, and Woodward presented her with an ultimatum on April 11 to either return to Alaska within three days or risk termination for abandoning her position. Therefore the Municipality cites incorrectly to the stricter standards of notice for foreseeable leave, 29 C.F.R. § 825.302(c), rather than § 825.303, which governs unforeseeable leave. The Municipality's reliance on case law is similarly misplaced.[35] Instead, federal precedent sup-

---

27. The question of whether this means that Gregg's FMLA leave would have "expired" since she had already been gone from her job more than the allowed 12 weeks by April will be discussed below.

28. *See* 29 U.S.C. § 2612; 29 C.F.R. § 825.302, 303.

29. 29 C.F.R. § 825.302.

30. *Id.* at § 825.303(a).

31. *Id.* at § 825.303(b).

32. *See Satterfield v. Wal–Mart Stores, Inc.,* 135 F.3d 973, 977 (5th Cir.1998).

33. *Id.* (quoting *Manuel v. Westlake Polymers Corp.,* 66 F.3d 758, 764 (5th Cir.1995)).

34. *Am. Computer Inst.,* 995 P.2d at 651.

35. The Municipality cites *Satterfield v. Wal–Mart Stores, Inc.,* 135 F.3d 973 (5th Cir.1998), where the plaintiff never directly contacted her employer and had a history of unexplained absences; Gregg was in frequent contact with Woodward, and had an excellent employment record until her accident.

ports a finding of proper notice where, as here, the plaintiff was initially placed on sick leave and mentioned an illness during her request for leave.[36]

#### d. Extent of leave under the FMLA

Finally, the Municipality claims that even if Gregg established the elements of her FMLA claim, she did not qualify for further FMLA protection because by April 11, 1997, the Municipality had already given her the full extent of leave permitted under the Act. According to the Municipality's argument, Gregg took thirteen weeks of leave before she resigned, which is actually more than the Act guarantees, thus she suffered no prejudice from its refusal to grant her further leave.[37]

The Municipality failed to raise this factual argument in the trial court, and it misstates the trial court's conclusion on appeal. The Municipality could be correct only if the court had found that it violated 29 C.F.R. § 825.700(a), the failure to properly *designate* Gregg's leave. Section 825.700(a) provides in pertinent part that "[i]f an employee takes paid or unpaid leave and the employer does not designate the leave as FMLA leave, the leave taken does not count against an employee's FMLA entitlement." For § 825.700(a) to be relevant, the Municipality would have had to establish that it had grant-

ed Gregg twelve weeks of FMLA leave concurrent with her regular department leave, and had simply failed to designate it as such. Instead the court found that Gregg was entitled to further FMLA leave in April, when she was forced to resign.[38] How much additional leave is a question of fact, which cannot be raised for the first time on appeal.[39]

#### 3. Wrongful termination

The trial court held that Gregg had proved her claim of wrongful termination by a preponderance of the evidence because she was constructively discharged[40]—forced to either resign or risk being fired and losing her certification on April 11—in the course of seeking leave that she was entitled to under federal, state, and local laws.

The Municipality claims that Gregg had a choice "other than resignation," because she could have returned to a light duty position at APD, and because she was not receiving any medical treatment which would have prevented her from returning. However, the court held explicitly that it was "reasonable for [Gregg] to resign" based upon the facts of the case. This finding may only be reversed if clearly erroneous, and there is sufficient evidence in the record for the court to reach this conclusion.[41] The Municipality's argument that no reasonable person would have felt compelled to resign in Gregg's situation

36. *See Spangler v. Fed. Home Loan Bank of Des Moines*, 278 F.3d 847, 853 (8th Cir.2002) (holding that plaintiff's statement that she was suffering from depression was sufficient to establish notice under the FMLA); *Tate v. Farmland Indus., Inc.*, 268 F.3d 989, 997 (10th Cir.2001) (noting that employer who placed employee on involuntary sick leave was clearly on notice that the FMLA might apply).

37. The Municipality cites to the United States Supreme Court decision in *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 122 S.Ct. 1155, 152 L.Ed.2d 167 (2002). It essentially argues that *Ragsdale* prevents an employee who receives more than 12 weeks of leave from ever filing suit under the FMLA. But *Ragsdale*, which came down after the trial court's decision, is inapposite because it struck down 29 C.F.R. § 825.700(a), which imposed an automatic penalty for failure to designate prior leave as FMLA-qualifying. 535 U.S. at 90, 122 S.Ct. 1155. That regulation, like the Municipality's argument on this issue, was not raised or contested in the trial court.

38. Counsel for the Municipality conceded at oral argument that if Gregg qualified for the Act's protection, the Municipality would have given her several more weeks of protection.

39. *See State v. Northwestern Const., Inc.*, 741 P.2d 235, 239 (Alaska 1987).

40. To show constructive discharge the employee must prove that a "reasonable person in the employee's position would have felt compelled to resign." *Charles v. Interior Hous. Auth.*, 55 P.3d 57, 60 (Alaska 2002). The superior court found that under Gregg's circumstances on April 11, 1997, "it was reasonable for her to resign to protect her law enforcement certification."

41. For example: Gregg endured her husband's threats, control, and holding her against her will while in Virginia and was incapacitated by injuries and mental stress.

is similarly defeated by the findings of the trial court that Gregg was between a "rock and a hard place" where she had to choose resignation to protect her certification.

### 4. Gregg's testimony

The Municipality debates the trial court's findings in favor of Gregg on several disputed facts. It argues that the court's belief in Gregg's testimony was clearly erroneous because other facts in the record contradict her version of events. The Municipality outlines four points of error: (1) that Gregg's testimony regarding her actions at her husband's bail hearing was inaccurate; (2) that Gregg's testimony about her purpose for leaving Alaska contradicts her earlier admissions; (3) that Gregg resigned for reasons other than the trial court's conclusions; and (4) that other evidence contradicts Gregg's claim that she attempted to rescind her resignation.

 Because they required an assessment of Gregg's credibility, we shall affirm the trial court's conclusions on these points unless clearly erroneous.[42] To reverse, we must have a definite and firm conviction that a mistake has been made.[43] Gregg reminds us that a trial court does not err simply by choosing between conflicting evidence.[44] Insofar as the Municipality relies upon Woodward's testimony to contradict Gregg's version of events, Gregg points to the trial court's finding that Woodward was less credible than other witnesses who confirm her recollections.

The Municipality's first contention is that Gregg's deposition testimony that she waited outside her husband's February arraignment is irreconcilable with her appearance in the actual record of that proceeding. At trial, Gregg admitted that she had made a mistake during the deposition: that she had simply forgotten that she did, in fact, enter the courtroom for Wimer's arraignment. The court was aware of her inconsistency. It was brought out by the Municipality during

cross-examination, and it was within the court's discretion to accept Gregg's excuse.

Second, the Municipality protests that Gregg told the judge at that arraignment that she expected her husband to follow her out of state, which is inconsistent with Gregg's testimony in this case that she fled the state to escape the domestic violence of her marriage. Again this inconsistency was explored by the Municipality during cross-examination, and the court found that Gregg left Alaska to be where she had family support.

Third, the Municipality argues that the trial court's conclusion that Gregg had to resign to protect her certification conflicts with the fact that her then husband, Michael Wimer, who knew nothing of her conversations with Woodward, faxed in her resignation. The Municipality maintains that this establishes a "fundamental inconsistency" and proves that Gregg was in fact reconciling with Wimer in April when she resigned and did not intend to return to the department. But the fact that Wimer faxed in Gregg's resignation is equally consistent with the premise that Gregg knew she had to quit to preserve her certification, knew Wimer wanted her to quit, and allowed him to fax in the resignation without explaining the circumstances of her conversations with Woodward.

Finally, the Municipality contends that no evidence corroborates Gregg's testimony that she called Woodward to rescind her resignation. The Municipality notes that Gregg did not mention the fact that she had attempted to rescind her resignation either in the course of background interviews during her attempt to get rehired, or in a subsequent taped conversation with Woodward. Indeed, at trial the court allowed the Municipality to fully impeach Gregg with this evidence. Our review of the record convinces us that, on this point as well as those above, the court reasonably decided between conflicting accounts and evidence.

**42.** Alaska R. Civ. P. 52(a).

**43.** *City of Hydaburg v. Hydaburg Coop. Ass'n,* 858 P.2d 1131, 1135 (Alaska 1993).

**44.** *See Wasserman,* 38 P.3d at 1166–67.

### 5. Prejudgment and postjudgment interest awards

 The Municipality asserts that the trial court incorrectly calculated the interest on Gregg's damages. The FMLA specifically allows for an award of interest on lost wages.[45] Under Alaska law, "prejudgment interest is a substantive right of an injured party." [46] The ordinary rule is that when suit is brought in state court under a federal statute, the substantive provisions of federal law govern the action.[47] For this reason, prejudgment and postjudgment interest calculations on FMLA claims should be decided under federal law.[48]

 Precedent interpreting the interest award provision of the FMLA is sparse.[49] Generally, the rate of federal prejudgment interest is at the discretion of the trial court, with the goal of fairly compensating the plaintiff.[50] The date when prejudgment interest accrues, unlike under our own statute, is also at the discretion of the court with the

same aim in mind.[51] Postjudgment interest is specifically provided for by statute. Under 28 U.S.C. § 1961, postjudgment interest shall begin at the date of entry of judgment and be set at a floating market rate.[52]

After considering the memoranda of the parties, the court found that federal law should determine the interest on Gregg's judgment, rather than Alaska statute. The court concluded that it should calculate prejudgment interest at a variable yearly rate from the date of Gregg's termination until the beginning of trial, and that postjudgment interest should commence at the date of trial. In setting the rate of postjudgment interest, however, the court found that the rate set by AS 09.30.070 should govern.

The Municipality argues that the court incorrectly calculated prejudgment interest because under Alaska law prejudgment interest accrues from the day the defendant receives notice of the complaint.[53] But here

---

**45.** See 29 U.S.C. § 2617(a)(1)(A)(ii).

**46.** City & Borough of Juneau v. Commercial Union Ins. Co., 598 P.2d 957, 959 (Alaska 1979).

**47.** See, e.g., Nunez v. Am. Seafoods, 52 P.3d 720, 722 (Alaska 2002) (finding that under the Jones Act, "the state courts must apply the same substantive law as would be applied had the suit been instituted in admiralty in a federal court") (citations omitted); Patterson v. State, Dep't of Agri., 880 P.2d 1038, 1041–42 (Alaska 1994) (holding that in suit against employer for breach of a collective bargaining agreement brought under federal Labor Management Relations Act, substantive principals of federal law must be applied).

**48.** See generally Carpenters Dist. Council of New Orleans & Vicinity v. Dillard Dep't Stores, Inc., 15 F.3d 1275, 1288 (5th Cir.1994) ("[F]ederal law governs the range of remedies, including the allowance and rate of prejudgment interest, where a cause of action ... arises out of federal statute.").

**49.** See, e.g., McDonnell v. Miller Oil Co., Inc., 134 F.3d 638, 640 (3rd Cir.1998) (affirming award of prejudgment interest on nominal award).

**50.** See, e.g., Jones v. UNUM Life Ins. Co. of America, 223 F.3d 130, 139 (2d Cir.2000) (noting that since no federal statute sets a prejudgment interest rate, the rate is at the discretion of the trial court); Towerridge, Inc. v. T.A.O., Inc., 111 F.3d

758, 764 (10th Cir.1997) (holding that when federal law governs the question of prejudgment interest the court has discretion to choose a rate which fairly compensates the plaintiff); Sun Ship, Inc. v. Matson Navigation Co., 785 F.2d 59, 63 (3rd Cir.1986) ("In federal question cases, the rate of prejudgment interest is committed to the discretion of the district court.").

**51.** Guides, Ltd. v. Yarmouth Group Prop. Mgmt., Inc., 295 F.3d 1065, 1078 (10th Cir.2002) (reversing trial court's decision that prejudgment interest should run from date determined by state statute, and remanding for the court "to consider the timing of the award of prejudgment interest that will serve to fairly compensate [the plaintiff] for the deprivation of the monetary value of its loss").

**52.** 28 U.S.C. § 1961 provides in relevant part:

(a) Interest shall be allowed on any money judgment in a civil case recovered in a district court.... Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding. (sic) the date of the judgment....
(b) Interest shall be computed daily to the date of payment except as provided in section 2516(b) of this title and section 1304(b) of title 31, and shall be compounded annually.

**53.** AS 09.30.070(b) provides in relevant part:

federal law applies and the timing of prejudgment interest is at the court's discretion. Even under our own statute, we have held that when the plaintiff claims economic damages, prejudgment interest should commence upon the date of injury.[54] It was within the court's discretion to decide that Gregg's award of back pay and prejudgment interest should begin on April 11, 1997, the date she was constructively discharged.

■ Next, the Municipality argues that postjudgment interest should have begun upon final judgment, rather than at the commencement of trial as the superior court decided. It suggests that a final, appealable judgment is a clear demarcation line, rather than the arbitrary date chosen by the trial judge. The court decided that because of the facts of the case and nature of the damages expert's testimony, that the date of final judgment was "an arbitrary date," and chose the approximate date the trial began instead. Since federal law governs Gregg's award of damages, postjudgment interest should have been calculated from the date specified in 28 U.S.C. § 1961: "[postjudgment] interest shall be calculated from the date of the entry of the judgment." Under the plain terms of the federal statute the Municipality is correct: the obligation to pay postjudgment interest only arises after the court renders final judgment. Similarly the rate of postjudgment interest should be the floating market rate prescribed by 28 U.S.C. § 1961. We therefore remand for the trial court to recalculate Gregg's postjudgment interest from the date of final judgment.[55]

## B. Gregg's Cross–Appeal

### 1. Liquidated damages

■ On cross-appeal, Gregg asserts by a number of arguments based on policy and precedent that the court improperly denied her liquidated damages.[56] Upon proof of a violation of the FMLA a plaintiff is entitled to lost wages, actual damages, and interest, plus an equal award of liquidated damages.[57] The court, in its discretion, may reduce the plaintiff's award to compensatory damages alone if the defendant "proves to the satisfaction of the court that the act or omission

---

**54.** *See Beaux v. Jacob,* 30 P.3d 90, 100 (Alaska 2001).

> ... [P]rejudgment interest accrues from the day process is served on the defendant or the day the defendant received written notification that an injury has occurred and that a claim may be brought against the defendant for that injury, whichever is earlier. The written notification must be of a nature that would lead a prudent person to believe that a claim will be made against the person receiving the notification, for personal injury, death, or damage to property.

**55.** The Municipality further notes that Gregg's expert admitted two mistakes with respect to her calculations of damages, and asks that Gregg's award be reduced by the amount of error, $2,910.04. We remand this issue to the court, so that upon proper motion, the final award may be adjusted in accordance with Alaska Civil Rule 60.

**56.** Because we hold that the court failed to adequately support its decision as required by the Act, it is unnecessary for us to decide whether or not, as Gregg urges, an award of liquidated damages is necessary to make her whole due to the tax consequences of the judgment in her favor.

**57.** 29 U.S.C. § 2617 provides in relevant part:

(1) Liability

Any employer who violates section 2615 of this title shall be liable to any eligible employee affected—
(A) for damages equal to—
(i) the amount of—(I) any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation; or (II) in a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee, any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care, up to a sum equal to 12 weeks of wages or salary for the employee;
(ii) the interest on the amount described in clause (i) calculated at the prevailing rate; and
(iii) an additional amount as liquidated damages equal to the sum of the amount described in clause (i) and the interest described in clause (ii), except that if an employer who has violated section 2615 of this title proves to the satisfaction of the court that the act or omission which violated section 2615 of this title was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of section 2615 of this title, such court may, in the discretion of the court, reduce the amount of the liability to the amount and interest determined under clauses (i) and (ii), respectively; and
(B) for such equitable relief as may be appropriate, including employment, reinstatement, and promotion.

which violated [the Act] was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of [the Act]."[58]

The trial court declined to award Gregg liquidated damages, finding only that "Woodward's lack of knowledge on the applicability of the FMLA when he informed Theresa that her leave without pay request had been denied does not establish that he was acting in bad faith." This finding does not satisfy the requirements of the Act. The Act requires liquidated damages unless the court makes express findings that the employer violated the Act in good faith and that there was a reasonable factual basis for the employer's action; in that case, the court *may* reduce the amount.[59] In the superior court's written decision there is no indication that the Municipality proved to the court that it refused Gregg's April leave request in good faith, or that there was a reasonable basis for the Municipality to do so. Given the incomplete findings of the trial court, we cannot resolve the issue, but on remand the court shall determine if the Municipality affirmatively established that its refusal to grant additional leave was in good faith and that reasonable grounds supported its decision.

### 2. Rate of postjudgment interest

■ Gregg further claims that the court should have applied the higher state statutory prejudgment interest rate rather than the federal. The main thrust of Gregg's argument is that since she pursued state and common law claims in addition to her cause of action under the FMLA, the higher state rate should apply. She relies in chief upon a Pennsylvania Superior Court case, *Humphries v. Pittsburgh and Lake Erie Railroad Co.*[60] *Humphries* presented the question

whether the state rule of prejudgment interest applied to an action brought in state court under the Federal Employers' Liability Act (FELA).[61] The court first noted that, "albeit a federal court sitting in diversity must look to local law to determine the availability of prejudgment interest, such is not the rule in cases arising under federal law."[62] Since FELA neither provides nor prohibits an award of prejudgment interest, the court held that it was appropriate to look to local law to fix the rate of the award.[63]

On the other hand the FMLA expressly provides for interest on a plaintiff's award. As noted above, where a federal claim predominates, federal law governs the compensatory measure of prejudgment interest.[64] The federal rule of prejudgment interest is to leave the setting of rates at the discretion of the trial court, and the court did not abuse its discretion here.

## IV. CONCLUSION

The trial court's finding that the Municipality violated Gregg's right to protected leave under the FMLA is AFFIRMED. We REMAND for recalculation of the interest and principal of her damage award, and for reconsideration of the issue of liquidated damages consistent with this opinion.

**58.** *Id.*

**59.** *Id.*

**60.** 328 Pa.Super. 119, 476 A.2d 919 (1984).

**61.** *Id.* at 921.

**62.** *Id.* at 922. This is the reason that Gregg's citations to federal precedent are unhelpful: certainly a federal court sitting in diversity shall

apply state law to determine an award of prejudgment interest. But here a state court decided a federal question, and federal law applies.

**63.** *Id.* at 926.

**64.** *See, e.g., Hardaway Constructors, Inc. v. Browning,* 176 Ga.App. 530, 336 S.E.2d 579, 582 (1985) ("[W]here a claim ... is governed by federal law, the question whether pre-judgment interest will be allowed is not controlled by the law of the forum state.").