*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| CASTLE PROPERTIES, INC., | ) | |
| | ) | Supreme Court No. S-15381 |
| | ) | |
| Appellant, | ) | Superior Court No. 3PA-11-02112 CI |
| | ) | |
| v. | ) | O P I N I O N |
| | ) | |
| WASILLA LAKE CHURCH OF | ) | No. 6996 – April 10, 2015 |
| THE NAZARENE, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Eric Smith, Judge.

Appearances: Kenneth D. Albertsen, Palmer, for Appellant. Ronald L. Baird, Office of Ronald L. Baird, Anchorage, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

BOLGER, Justice.

## I.      INTRODUCTION

Castle Properties, Inc. held a right of first refusal on approximately 2.4 acres of unimproved land owned by the Wasilla Lake Church of the Nazarene (Church). The City of Wasilla (City) offered the Church another parcel of approximately 17 acres in exchange for this property. Having learned of the City's offer, Castle Properties

requested a copy of the purchase and sale agreement memorializing the exchange. The Church, apparently unaware of the right of first refusal, denied this request. Castle Properties then informed the Church that it was exercising its right of first refusal and submitted a cash offer, which the Church rejected.

Castle Properties filed suit, and the superior court found that Castle Properties received adequate notice when it obtained the city ordinance approving the City's offer and that the Church acted reasonably in rejecting Castle Properties' competing cash offer. We conclude that the superior court did not clearly err in finding that Castle Properties received adequate notice, that Castle Properties exercised its rights by making a competing offer, and that the Church's response did not violate the covenant of good faith and fair dealing.

## II.    FACTS AND PROCEEDINGS

The property underlying this dispute is located in the Lakebrook Subdivision in Wasilla, near the Cottonwood Creek Mall. Castle Properties seeks to purchase the southern portion of Tracts 3 and 4 (Property), bounded by the Palmer-Wasilla Highway to the north and Cottonwood Creek to the south.[1]

In 1984 the Baugh Construction and Engineering Profit Sharing Trust (Trust) began acquiring property in the Lakebrook Subdivision. Gary Baugh, the trustee, believed that if the Trust could acquire contiguous properties across Tracts 1 through 5, they would present "an attractive piece of real estate for a developer." The Trust first acquired the southern portions of Tracts 1 and 2 and then set its sights on the southern portions of Tracts 3, 4, and 5.

---

[1]    The Palmer-Wasilla Highway was relocated in the 1980s so that it laterally bisected Tracts 3 and 4, as well as adjacent Tracts 1, 2, and 5. References to the "northern" and "southern" portions of these tracts refer to the areas north and south of the Palmer-Wasilla Highway.

At this time, title to Tracts 3 and 4 was held by the "Alaska District, Church of the Nazarene." But the church association that would eventually become the Wasilla Lake Church of the Nazarene negotiated with the Trust and executed the relevant transaction. Tract 5 was owned by the Church's pastor, John Vaughn, and his wife. Vaughn wanted the Church to purchase the northern portion of Tract 5. And according to Baugh, the Trust was interested in acquiring the southern portion, contingent on the possibility of someday acquiring the adjacent portions of Tracts 3 and 4.

The parties therefore crafted the following exchange. The Trust purchased the entirety of Tract 5 from the Vaughns for $310,000. The Trust then kept the southern portion for itself, but sold the northern portion to the Church, in exchange for $100,000 and a right of first refusal to purchase the southern portions of Tracts 3 and 4 — the Property. The end result was as follows: the Vaughns sold Tract 5 for $310,000; the Church acquired the northern portion of Tract 5; and the Trust, in essence, paid $210,000 for the southern portion of Tract 5 plus the opportunity to purchase the adjoining Property at some point in the future.

The document memorializing the right of first refusal stated that the Church "grant[ed] the . . . Trust First Right of Refusal on any future sale" of the Property. There is no evidence that the parties agreed to more detailed terms regarding the duties owed by either party pursuant to this right. The Trust recorded this document in 1996. In 2002 Castle Properties purchased all of the Trust's interests in Tracts 1 through 5 — including the right of first refusal to purchase the Property.

As early as 2004 the Church's board began discussing the shortcomings of the Church's facilities and the need to relocate to a larger and more suitable site. The Church decided to sell the Property as part of this relocation strategy, and in 2010 the Church listed the Property for $600,000. Gary Lundgren, Castle Properties' owner, submitted two cash offers for the Property through his agent, Kevin Baker. These offers

were made in April and July 2010 for $265,000 and $300,000, respectively. The Church rejected both offers, but the Church's real estate agent, Tammy Ervin, inquired whether Lundgren had 20 acres of land available for an exchange instead. Baker told Ervin that Lundgren was not interested in a property exchange. He did not mention Castle Properties' right of first refusal at this time.

Around the same time the Church signed a non-binding letter of intent with the City to exchange the Property for approximately 20 acres of City land. On April 11, 2011, a draft ordinance ratifying this exchange was introduced. The ordinance identified the City property to be traded (City Trade Land) and its approximate acreage. The accompanying staff report specifically noted the Church's "desire to relocate onto a large parcel." And attached to the ordinance was a title report with the tax-assessed value of the parcel encompassing the City Trade Land.

Castle Properties was unaware of the City's offer until April 2011, when Baker attended a City Council meeting where the exchange was discussed. Having learned of the potential conveyance to the City, Baker tried to acquire a copy of the Purchase and Sale Agreement (Purchase Agreement) between the City and the Church, but his requests were denied. Baker testified that he also attempted to set up a meeting with the Church but that the Church declined to participate.

On May 18, 2011, Castle Properties recorded a document entitled "Notice of Exercise of First Right of Refusal." This notice stated that, having learned of the City's offer, Castle Properties was exercising its right to purchase the Property on "equivalent terms," which Castle Properties deemed to be $153,000. There was testimony at trial suggesting that the then-current Church leaders were unaware of Castle Properties' right of first refusal until this document was recorded.

On May 27 Castle Properties' attorney sent the Church a letter reiterating Castle Properties' election to exercise its right of first refusal by purchasing the Property

for $153,000, noting that "[a] real estate broker has confirmed that this is the upper end of fair market value for the [City] Trade Land." Castle Properties informed the Church that it had placed $153,000 in escrow, urged that "time [was] of the essence," and requested a closing by June 7, unless "alternative arrangements" had been made. The Church responded with a letter informing Castle Properties that its right of first refusal appeared unenforceable and that unless Castle Properties could show legal authority to the contrary, the Church intended to close the transaction with the City on August 11.

Castle Properties filed suit on August 9, seeking specific performance of its right of first refusal. Castle Properties also recorded a lis pendens on the Property. The Church counter-claimed, seeking a decree quieting title to the Property and a declaratory judgment to the same effect.

In analyzing the duties owed under a right of first refusal, the superior court first noted that our decision in *Roeland v. Trucano*[2] provides the relevant framework. The court found that, under *Roeland*, Castle Properties received "adequate notice" of the City's offer through the City ordinance outlining the proposed land exchange.[3] Next, the superior court noted that the City Trade Land was a "unique" offer, which served as an invitation to Castle Properties to submit a "commercially equivalent offer."[4] At trial, the Church's expert appraiser placed the value of the City Trade Land at $250,000, and Castle Properties offered no rebuttal expert. Given the Church's interest in "obtain[ing] an affordable parcel of land that was suitable for a new church," the superior court found

---

[2]    214 P.3d 343 (Alaska 2009).

[3]    *See id.* at 348 ("The general rule is that when an owner receives an offer to purchase an interest in a property burdened with a right of first refusal, the owner must provide adequate notice of the terms of the offer to the holder of the right.").

[4]    *See id.* at 349.

that Castle Properties' $153,000 cash offer was not commercially equivalent to the City's offer. Accordingly, the court expunged the lis pendens on the Property and quieted title free of any interest related to Castle Properties' right of first refusal.[5]

Castle Properties now appeals.

## III.  STANDARD OF REVIEW

"Questions regarding the adequacy of notice are questions of fact."[6] "Under [Alaska] Civil Rule 52(a), factual findings shall not be set aside unless they are clearly erroneous. A finding is clearly erroneous only if the reviewing court is left with a 'definite and firm conviction that a mistake has been made.' "[7] "When reviewing factual findings, we view the evidence in the light most favorable to the prevailing party below."[8] "We review questions of law using our independent judgment and will adopt 'the rule of law that is most persuasive in light of precedent, reason and policy.' "[9]

## IV.  DISCUSSION

On appeal Castle Properties does not argue that the Church should have accepted its $153,000 cash offer. Rather, Castle Properties contends that it lacked

---

[5]     The superior court also considered the Church's argument that the right of first refusal was unenforceable. The Church offers this argument on appeal as an alternative basis for affirming the superior court's decision. Because we affirm the superior court's decision based on its *Roeland* analysis, we do not need to reach the Church's unenforceability argument.

[6]     *Roeland*, 214 P.3d at 348 (citing *Jensen v. Alaska Valuation Serv., Inc.*, 688 P.2d 161, 164 (Alaska 1984)).

[7]     *Id.* at 347 (quoting *Municipality of Anchorage v. Gregg*, 101 P.3d 181, 186 (Alaska 2004)).

[8]     *Id.*

[9]     *Id.* at 347-48 (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n.6 (Alaska 1979)).

adequate information to formulate an "equivalent" offer. Accordingly, Castle Properties now asks to purchase the Property either for the appraised value of the City Trade Land ($250,000) or the "Church-determined" value of the Property ($291,000).

A.    **Castle Properties Received Adequate Notice Of The City's Offer.**

Castle Properties argues that the Church failed to provide the legally required notice of the City's offer to purchase the Property. In *Roeland*, we outlined the duties owed under a right of first refusal:

> The general rule is that when an owner receives an offer to purchase an interest in a property burdened with a right of first refusal, the owner must provide adequate notice of the terms of the offer to the holder of the right. Adequate notice is notice sufficient to enable the holder of the right of first refusal (the right-holder) to decide whether to attempt to match the terms. Once the seller has made reasonable disclosure of the material terms, the right-holder has a duty to further investigate any terms that he or she finds unclear.[10]

We further stated that "[t]he offer's terms must be sufficiently definite to evaluate, and all essential terms in the third-party offer must be communicated to the right-holder. Generally, this means a written copy of the offer or agreed terms should be provided."[11]

Like this dispute, *Roeland* involved an effort to enforce a right of first refusal where the competing offer was "unique."[12] There, the owners of the property burdened by the right received the following offer: a retailer would "purchase" 25% of the property by granting the owners a 25% interest in any stores he operated in the

---

[10]    *Id.* at 348 (citations omitted).

[11]    *Id.* (citations omitted).

[12]    *Id.* at 346, 349.

building.[13] The property owners memorialized this offer in a memorandum of understanding (MOU) and provided the right-holders with a copy.[14] Although the right-holders "provide[d] an extensive list of details missing from the MOU," we concluded that "the absence of these details [did] not leave the essential terms of the transaction unclear."[15] We therefore affirmed the superior court's finding that the sellers had not breached the right of first refusal.[16]

Here, the superior court found that Castle Properties received adequate notice of the City's offer through the ordinance adopted at the Wasilla City Council meeting on April 25, 2011 (Ordinance). Although the Church refused to give Castle Properties a copy of the Purchase Agreement, the superior court concluded that the Ordinance was sufficient to inform Castle Properties of the offer's "material" terms — namely, "what land was involved." As the court reasoned, any provisions contained only in the Purchase Agreement pertained merely "to implementation and related matters."

As an initial matter, the superior court was correct to note that the Church had no duty to notify Castle Properties about its *negotiations* with the City. Under *Roeland*, the duty to provide notice arises only once "an owner receives an offer to purchase an interest in a property burdened with a right of first refusal."[17] Accordingly,

---

[13]     *Id.* at 346.

[14]     *Id.*

[15]     *Id.* at 348-49.

[16]     *Id.*

[17]     *Id.* at 348; *see also H.G. Fabric Disc., Inc. v. Pomerantz*, 515 N.Y.S.2d 823, 825 (App. Div. 1987) (holding that a conditional offer did not trigger a right of first refusal).

the Church's duty to notify did not arise until April 25, 2011, when the Wasilla City Council actually approved the proposed land exchange with the Church.

Castle Properties contends, however, that the Ordinance provided inadequate notice of the City's offer. Its arguments are essentially two-fold. First, Castle Properties argues that the Church should have disclosed its "criteria" for suitable trade land. Second, Castle Properties claims that it was entitled to a copy of the Purchase Agreement because the Ordinance omitted certain terms of the transaction.

With regard to the Church's criteria for suitable trade land, the process Castle Properties seeks is beyond the scope of what its right of first refusal ensured. Citing testimony from Church members, Castle Properties alleges that the Church deemed 10 acres to be an acceptable size; approved a "4-mile radius" as a relocation range; and established criteria for "items such as city water and sewer, access, price, and 'not swampland.' " But it is not evident from the record that the Church ever memorialized such specific criteria for a relocation site. For instance, one Church board member described the process of finding a site for relocation as "very fluid," explaining that "as opportunities have presented themselves, [the Church has] evaluated each one on its own merits." Moreover, Castle Properties itself points out that the City Trade Land did not meet all of the "criteria" alluded to in the Church's testimony.

It is true that because the City's offer of land was a "unique offer," Castle Properties was not in a position to precisely "match the [City's] terms."[18] But we expressly addressed this issue in *Roeland*, noting:

> Where a commercial seller has received a unique offer that a right-holder could not exactly duplicate, we agree with courts characterizing the submission of the offer to the right-holder as an invitation to the right-holder to submit a commercially

---

[18]    *See Roeland*, 214 P.3d at 348-49.

equivalent offer. The right-holder may propose comparable terms to the original offer which are possible for him to meet and which would meet the seller's commercial interests.[19]

The adoption of the Ordinance therefore served as an invitation to Castle Properties to propose "comparable terms." It did not obligate the Church to formulate specific criteria that would govern the Property's sale.[20]

Castle Properties was, however, entitled to "adequate notice" of the material terms of the City's offer.[21] Castle Properties argues that, "[a]t a minimum," this required the Church to provide Castle Properties with a copy of the Purchase Agreement. But under *Roeland* and other relevant authority, the Church was obligated to disclose only the "material terms" of the City's offer.[22] Castle Properties contends that the Ordinance

---

[19]     *Id.* at 349-50 (citations omitted).

[20]     *See id.* at 350 ("[T]he owner of property subject to a right of first refusal remains master of the conditions under which he will relinquish his interest, as long as those conditions are commercially reasonable, imposed in good faith, and not specifically designed to defeat the preemptive rights." (alteration in original) (quoting *W. Tex. Transmission, LP v. Enron Corp.*, 907 F.2d 1554, 1566 (5th Cir. 1990) (internal quotation marks omitted)).

[21]     *See id.* at 348.

[22]     *See id.* at 348-49 (concluding that the absence of certain "details [did] not leave the *essential* terms of the transaction unclear" (emphasis added)); *see also Dyrdal v. Golden Nuggets, Inc.*, 672 N.W.2d 578, 584 (Minn. App. 2003) ("In most cases, a copy of the purchase agreement provides reasonable notice of a bona fide offer, even if the agreement does not disclose *all* of the terms of the sale." (emphasis added) (citing *Koch Indus. v. Sun Co.*, 918 F.2d 1203, 1212-13 (5th Cir. 1990))); *but see Gyurkey v. Babler*, 651 P.2d 928, 931 (Idaho 1982) ("[T]he holder of such a right of first refusal cannot be called upon to exercise or lose that right unless the *entire* offer is communicated to him in such a form as to enable him to evaluate it and make a decision.") (emphasis in original)). In *Gyurkey*, the court also appeared skeptical about the accuracy of a key *material* term — the sales price. *Id.* at 932 (noting that "it is

(continued...)

"omitted many relevant factors" that the Purchase Agreement contained, including the City Trade Land's "actual description," its "actual acreage," and "closing deadlines or extension thereof, allocation of closing costs, joint payment of sales commissions, and joint payment of survey fees." We conclude that some of these terms were adequately covered in the Ordinance and that the others were immaterial.

With respect to the "actual description" of the City Trade Land, the Ordinance admittedly characterized it only as "*a portion* [of] Tax Parcel A6, Section 16, Township 17 North, Range 1 West Seward Meridian, Alaska." (Emphasis added.) But an arrow on the map appended to the Ordinance identified the City Trade Land as that portion bounded by West Riley Avenue, South Center Point Drive, and the parcel's boundaries. The Ordinance thus adequately expressed the "actual description" of the City Trade Land. Similarly, Castle Properties points out that the Ordinance omitted the "actual acreage" of the City Trade Land. The Ordinance indeed described the City Trade Land as "approximately 20 acres" when its actual acreage, according to a City subdivision map, was 17.33. But neither the Ordinance *nor* the Purchase Agreement identified the exact acreage of the City Trade Land, and it appears that this information was publicly available.

Nor does Castle Properties explain how knowing the exact acreage of the City Trade Land would have helped Castle Properties better match the City's terms. Castle Properties crafted its cash offer based on the assumption that the Church would receive "half" of a 40-acre parcel — 20 acres. Accordingly, the likely effect of knowing the "actual acreage" of the City Trade Land would have been a downward adjustment

_____

²  (...continued)
simply impossible for a preemptive rightholder to verify the precise price . . . at which he is entitled to purchase the property").

in Castle Properties' valuation, and Castle Properties' offer of $153,000 already fell significantly short of the Property's appraised value.

As for the remaining items Castle Properties mentions — closing deadlines and costs, payment of sales commissions, and survey fees — it was not clear error to characterize these as "pertain[ing] to implementation and related matters." Castle Properties does not develop its argument as to why these terms were material, and there is no evidence that knowledge of these terms would have helped Castle Properties decide whether to match the City's offer. It was therefore not clear error to find that the Ordinance constituted adequate notice of the City's offer to purchase the Property.

## B.    The Church Did Not Deprive Castle Properties Of A Reasonable Opportunity To Meet The City's Offer.

Castle Properties argues it should have been given a "reasonable time period" to match the City's offer.[23] Specifically, Castle Properties contends that "time was not of the essence" because the Church had been working on relocation since 2004 and no closing deadline was stated in the Purchase Agreement. The document memorializing Castle Properties' right of first refusal was silent as to how long the right-holder would have to exercise, and we have held that where a contract does not specify a time limit for performance, a "reasonable period" may be implied.[24]

---

[23]    In this portion of its brief, Castle Properties also claims that the Church "refused to dialogue or communicate," "would not cooperate to enable Castle Properties to exercise its Right of First Refusal," and could have purchased suitable relocation property with the cash value of the City Trade Land. But because these arguments are more closely related to the covenant of good faith and fair dealing, we address them in Part IV.C.

[24]    *See, e.g., Hall v. Add-Ventures, Ltd.*, 695 P.2d 1081, 1089 (Alaska 1985) ("Where no provision is made as to time of performance, a reasonable time is implied, to be determined upon consideration of the subject matter of the contract, what was

(continued...)

But given the course of events, we conclude that Castle Properties had reasonable time to exercise its right of first refusal after discovering the City's offer at a City Council meeting in April 2011. The superior court found that

> [t]here is no reason why [Castle Properties] could not have testified at the City Council meeting in April, or sent a letter to the City and Church prior to that meeting that explicitly notified them of the existence of the right of first refusal . . . . Such a step undoubtedly would have had an impact on the Council's deliberations, and given [Castle Properties] adequate time to develop an offer.

We see no clear error in the superior court's finding that Castle Properties itself could have taken steps to secure additional time.

Rather than attempting to slow down the City's consideration of the proposed land exchange, Castle Properties instead took the time to craft a formal offer with a deadline. Castle Properties then submitted an offer to purchase the Property for $153,000 and unequivocally indicated that it was exercising its right of first refusal. And in its letter dated May 27, 2011, Castle Properties *itself* urged that "time is of the essence" and requested a closing by June 7, 2011. Accordingly, Castle Properties received a reasonable opportunity to exercise its right of first refusal.

---

**24** (...continued)
contemplated at the time the contact was made, and other surrounding circumstances."); *see also Firebaugh v. Whitehead*, 559 S.E.2d 611, 616 (Va. 2002) (noting that a "reasonable time" is implied in the context of a right of first refusal); *see also* RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) § 4.3 cmt. c (2000) (noting that once a right of first refusal ripens into an option to purchase, the duration of the option is limited to a "reasonable time").

## C. The Church Did Not Breach Its Duty Of Good Faith And Fair Dealing.

Under Alaska law, every contract has an implied covenant of good faith and fair dealing[25] requiring "that neither party . . . do anything which will injure the right of the other to receive the benefits of the agreement."[26] As we noted in *Roeland*,

> [b]ad faith in right of first refusal transactions is not found where a party undertakes an act permitted by the contract, even if the motivations are unpleasant. Rather, it is typically found where the seller does not have a legitimate interest in the terms of the third-party offer, deliberately omits terms in relaying the offer to the right-holder, or does not deal at arms length with the third-party offeror.[27]

Here, Castle Properties argues that "[e]verything . . . [the Church] did between 2010 and the present" was either calculated toward or had the effect of depriving Castle Properties of the benefit of its right of first refusal. But Castle Properties does not appear to argue that the Church lacked a "legitimate interest" in the City Trade Land or failed to deal at arms-length with the City. Instead, Castle Properties highlights the Church's alleged failure "to provide notice of the offer" and its refusal "to provide information when requested."

Castle Properties also contends that the Church acted in bad faith by denying the validity of the right of first refusal. In response to Castle Properties' "exercise" of its right of first refusal, the Church indeed expressed its opinion that the right was unenforceable, a position that the Church has maintained throughout this litigation. But Castle Properties does not further develop its argument as to why this

---

[25] *Alaska Pac. Assurance Co. v. Collins*, 794 P.2d 936, 947 (Alaska 1990).

[26] *Jackson v. Am. Equity Ins. Co.*, 90 P.3d 136, 142 (Alaska 2004) (quoting *Guin v. Ha*, 591 P.2d 1281,1291 (Alaska 1979) (internal quotation marks omitted).

[27] 214 P.3d at 351 (citations omitted).

position constitutes bad faith. And even if the Church's view informed its rejection of Castle Properties' offer, Castle Properties does not argue that the Church was obligated to accept the $153,000 that Castle Properties offered for the Property. Accordingly, Castle Properties has not shown that the Church's denial of the right's validity "injure[d] the right of the other to receive the benefits of the agreement."[28]

The superior court did not make a separate conclusion of law on Castle Properties' good faith and fair dealing claim. But the court did find that "the members of the Church hierarchy had no knowledge that the right of first refusal existed" until May 2011, when Castle Properties recorded its "Notice of Exercise." The court also credited testimony from the Church's real estate agent that she was unaware of Castle Properties' right of first refusal until "[a]round the third week of May 2011."

Castle Properties characterizes the Church's asserted ignorance as "difficult to believe." As Castle Properties correctly points out, the right of first refusal was recorded in 1996. The Church also had in its files a 2006 "Property Profile" prepared by a title company, which included a copy of the right of first refusal along with several other recorded documents.

But as the superior court observed, the Church's files were "a mess," a view supported by the testimony of Brian Thomas, who served as the Church's pastor from 2005 to 2010. Thomas testified that there was not an "organized filing system" when he arrived, and that although Church members tried to "track down stuff as best [they] could," the lack of "central record keeping . . . was a source of great frustration."

Moreover, three witnesses who participated in Church decision-making during the relevant time period testified that they were personally unaware of the right

---

[28] *See Jackson*, 90 P.3d at 142 (internal quotation marks omitted) (citation omitted).

of first refusal until Castle Properties exercised it in May 2011. Thomas testified that he first learned of the right of first refusal when contacted for this litigation. Paul Hartley served as the Church of the Nazarene's Alaska District superintendent from June 2010 onward and chaired the Church's board after Thomas resigned. Hartley testified that although he could not recall exactly when he learned of the right of first refusal, it was probably at the Church's May 22, 2011 board meeting, and that the Church's board had previously been unaware of it. Michael Messick, a Church board member serving from 2005 through the date of the trial, similarly stated that he was unaware of Castle Properties' right until the May 22, 2011 board meeting, and that it came as a "big surprise."

It is true that after learning of the proposed land exchange, Baker asked to meet with the Church and requested a copy of the Purchase Agreement. But Castle Properties does not specifically allege — and there is nothing in the record to suggest — that Baker actually brought the right of first refusal to the Church's attention in making these inquiries. The superior court found that Castle Properties learned of the City's offer in April 2011, yet "chose not to bring the right of first refusal to the attention of the Church or the City until the end of May" — a point that Castle Properties does not appear to dispute. Based on this record, we see no clear error in the superior court's finding that the Church was unaware of the right of first refusal until Castle Properties attempted to exercise it in May 2011. And in light of the Church's ignorance as to Castle Properties' legal interest in the Property, we cannot say that the Church's refusal to meet with Baker or respond to his inquiries was in bad faith.

Castle Properties argues that, "even assuming [the Church's] claim of earlier ignorance to be true, [the Church's] actions from May 2011 onward were not

what a reasonable person would consider fair."[29] But in light of Castle Properties' own conduct, the Church's actions were not objectively unreasonable. Castle Properties unequivocally expressed that it was exercising its right of first refusal through recorded documents and Castle Properties' May 27, 2011 letter to the Church. And all of these documents expressed Castle Properties' intent to purchase the Property for a particular cash value. It was therefore reasonable for the Church to treat these communications as an offer to purchase the Property for $153,000.

At oral argument before us, Castle Properties attempted to recast its May 27 letter as an invitation for further dialogue. The letter stated:

> Although my client is determined to exercise its rights under the First Right of Refusal to buy the Property, it is not my client's desire to hinder the Church from acquiring the Trade Land. We believe that a win/win solution should be possible in which my client acquires the Property from the Church, the Church acquires the Trade Land from the City of Wasilla, and the City of Wasilla receives fair market value for its sale of the Trade Land to the Church.

The letter then noted Baker's prior request to meet with the Church and stated that Castle Properties "remain[ed] willing to cooperate in working toward a solution that ideally would leave everyone satisfied."

But Castle Properties' letter also stated that $153,000 plus closing costs had been deposited with McKinley Title, advised that "time [was] of the essence in this matter," and requested a closing by June 7, 2011 unless "alternative arrangements [had] been made." The letter did not specifically request a meeting, further information, or

---

[29]     The implied covenant of good faith and fair dealing requires not only subjective good faith, but also that both parties "act in a way that a reasonable person would consider fair." *Hawken Nw., Inc. v. State, Dep't of Admin.*, 76 P.3d 371, 381 (Alaska 2003).

more time in which to formulate an offer. Nor is there any evidence that the Church unreasonably rejected Castle Properties' "win/win solution." The Ordinance suggests that the City was interested in acquiring the Property to "provide parking and access" to a greenbelt development "located directly across Cottonwood Creek." And in a letter dated July 8, 2011, the Church informed Castle Properties that "[i]t appears that the City of Wasilla is not interested in the cash payment you proposed in your letter."

Having received Castle Properties' offer, the Church's only remaining duty was to employ "commercially reasonable standards" in evaluating it.[30] *Roeland*'s requirement that sellers use "commercially reasonable standards" to evaluate unique competing offers is tied to the seller's "invitation to the right-holder to submit a commercially equivalent offer."[31]

Castle Properties represented to the Church that its offer of $153,000 was "equivalent" to the City's offer. Although Castle Properties based its offer on the land's tax-assessed value, we have previously recognized that a tax assessment is "notoriously unreliable as a criterion of true value."[32] And Castle Properties never had the City Trade Land commercially appraised, which likely would have revealed that the Property was worth more on the open market than the tax appraisal of $153,000. Thus, Castle Properties should have known that its cash offer of $153,000 based on the tax-assessed

---

[30] *See Roeland*, 214 P.3d at 349-50 (stating that after a right-holder submits an offer, "[t]he seller then has a duty to use commercially reasonable standards to evaluate the two offers").

[31] *Id.*

[32] *Disotell v. Stiltner*, 100 P.3d 890, 895 n.10 (Alaska 2004) (quoting *State v. 45,621 Square Feet of Land*, 475 P.2d 553, 557 (Alaska 1970)) (internal quotation marks omitted).

value of the City Trade Land may not have been "commercially equivalent" to the City's offer.

The Church's expert witness testified at trial that the fair market value of the City Trade Land was $250,000. And notably, Castle Properties' request for relief from this court asks for a judgment requiring the Church to sell the Property "for the appraised value of the City Land at $250,000 or for the Church-determined value of $291,000," which suggests that Castle Properties does not dispute that the market value of the City Trade Land was at least $250,000. There was also testimony suggesting that $153,000 would have been inadequate for the Church to purchase suitable relocation land. Accordingly, the superior court could reasonably conclude that the Church's rejection of Castle Properties' offer was neither unreasonable nor in bad faith.

Castle Properties also appears to argue that the Church acted in bad faith by favoring a land trade over a cash offer. Castle Properties contends this preference was motivated by the Church's "desire to avoid [] or at least indefinitely defer" paying one-half of the sale proceeds to the Ocean Park Community Church under the terms of a deed restriction negotiated with the Property's original donor. But the Church had also encountered serious problems in finding suitable property that would meet its needs. On balance, the record supports the superior court's conclusion that it was commercially reasonable for the Church to favor a land trade over cash payment, given the problems the Church had encountered in finding affordable property.

V.    CONCLUSION

We therefore AFFIRM the superior court's judgment.