*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| DANYELLE D. KIMP, | ) | |
| | ) | Supreme Court No. S-17298 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-17-04469 CI |
| v. | ) | |
| | ) | O P I N I O N |
| FIRE LAKE PLAZA II, LLC, | ) | |
| | ) | No. 7507 – March 5, 2021 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Gregory Miller, Judge.

Appearances: Danyelle D. Kimp, pro se, Eagle River, Appellant. Gregory R. Henrikson, Walker & Eakes, Anchorage, for Appellee.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

STOWERS, Justice.

## I.    INTRODUCTION

A business owner formed a brewing company with plans to open a brewpub in Eagle River. He signed a lease that provided rent-free access to a commercial unit for a period of time to allow him to prepare the rental space prior to opening for business. But the brewing company encountered numerous delays during construction and did not open for business as planned. It also did not pay rent once the rent-free period ended.

After the property owner received no rent for several months, it entered the property and changed the locks.

The business owner filed suit, claiming the property owner breached the lease, tortiously interfered with a business relationship, and breached the implied covenant of good faith and fair dealing. The property owner counterclaimed that the brewing company breached the lease.

On cross-motions for summary judgment, the superior court dismissed all claims against the property owner and ruled in the property owner's favor on its counterclaim. The court also denied the business owner's request to compel discovery and awarded the property owner over $200,000 in damages. The business owner appeals the superior court's grants of summary judgment, its denial of his motion to compel discovery, and its award of damages. We affirm.

## II.  FACTS AND PROCEEDINGS

### A.  The Lease

In January 2016 Danyelle Kimp entered into a 66-month lease with Fire Lake Plaza II, LLC (Fire Lake) on behalf of Kimp's company, QUAKE! Brewing Company, LLC (Quake). Quake and Fire Lake were the parties to the lease agreement, but the lease included a guaranty agreement between Kimp and Fire Lake that made him personally liable for Quake's failure to pay rent and any other violations of the lease. The lease granted Quake rent-free limited possession of a commercial unit in Eagle River for an initial six-and-a-half-month period — the "fixturing period" — allowing Quake to build out the space prior to opening a brewpub there.

The lease required Quake to pay rent monthly upon expiration of the fixturing period. It also required Quake to conform its use of the space to specific rules and regulations outlined in the lease. Among these rules was a prohibition on uses that would constitute a nuisance or unreasonable annoyance to other tenants in the plaza,

including the use of loudspeakers or other sound or light fixtures that could be heard or seen outside of the unit.

The lease also outlined the conditions and remedies available to Fire Lake in the event of default. Failure to pay rent when due was considered immediate grounds for default. For other violations, the lease required Fire Lake to give notice of the applicable lease provision that had been violated. Quake would then have ten days to cure the violation before a default occurred. A default under the lease triggered a set of remedies available to Fire Lake "cumulatively or in the alternative." Among these was the right to enter and relet the unit.

**B.      Events Leading To Litigation**

Quake's leasehold interest began in February 2016. In April and May Kimp encountered delays in getting water shut off to the unit so he could perform necessary plumbing work. Kimp and Fire Lake's property management company initially agreed on a date in mid-to-late April to shut the water off, but one of the other tenants in the plaza indicated this would be disruptive. Further coordination around an early May date also proved unsuccessful, as the parties could not agree on a time that would work for Quake's plumber and the other tenants in the plaza. Eventually, the water was shut off in mid-June.

The parties also coordinated around Quake's efforts to obtain a special land use permit from the Municipality of Anchorage. In February 2016 Laura Cantrell, a broker at the property management company, signed off on Kimp's permit application. The application stated that only recorded music, and no live music, would be played at the brewpub. In April Cantrell expressed some concern with building plans Kimp submitted for approval that called for a stage and did not explain how Quake would handle soundproofing. Kimp responded that the stage was for a "possible 'future' development." Cantrell reiterated that the permit application stated there would be no

live music, and voiced concerns that Kimp was planning to build a bar rather than a brewpub. She also highlighted the commercial unit's proximity to residential property and the need to control noise levels within the establishment. Kimp replied, "The stage was always optional. I do not have to build it." He indicated he could always put "a fully developed performance stage" at another location.

The Anchorage Assembly passed a resolution approving an amended version of Quake's permit application. One of the amendments was that "[l]ive music and amplified sound systems [should] cease operations" at specified hours. The resolution also stated that Quake could not begin operations until it submitted relevant portions of the rental agreement demonstrating Fire Lake's consent to the amended permit and Quake's proposed operations under it.

In subsequent communications Kimp outlined for Cantrell lease modifications required by the Assembly. Among these were changes related to "noise being heard beyond [the] rented space" and "the allowable hours/terms for entertainment and amplified events." Cantrell responded she would work on the modifications and get back to Kimp. But she never made any modifications.

Quake did not pay any rent due under the lease other than prepayment of the first month's rent when it signed the lease. Quake also experienced delays in construction, and in a November 2016 meeting with Cantrell, Kimp requested additional time to complete the build-out and an extension of the rent-free fixturing period. It is disputed whether Cantrell orally agreed in that meeting to abate Kimp's rent payments until construction was complete. Kimp alleges that Cantrell refused to put her promise to abate rent in writing.

In mid-December a veteran-owned non-profit allegedly agreed to help Kimp finish construction. The following day, however, Cantrell entered the property,

posted a notice to vacate, and changed the locks. She met Kimp at the property to allow him to obtain some personal items and personally handed him the notice.

The notice prohibited access to the unit until January 2017. Fire Lake allowed representatives of the non-profit to enter the unit and assess requirements for completing construction. But the next day the non-profit declined to do business with Kimp.

Fire Lake later sent Kimp a notice of default, outlining numerous lease violations that Quake had committed; the notice gave Quake ten days to cure all non-access defaults. It also stated:

> To prevent further liability, damages and liens, I have changed the locks, and I am exercising Landlords [sic] Rights to utilize Alternative means to protect Landlord's rights and protect the property from further Tenant negligence.
>
> You are currently insisting on access and engaging a NEW contractor to install another $300,000 in improvements per your text message to me yesterday . . . . [U]ntil tenant remedies all existing non-access defaults listed above in the required time allotment, the premises will remain locked and unavailable for access by Tenant and any persons under Tenant's direction.

## C. Proceedings

A few weeks after Fire Lake locked Kimp out of the unit, Kimp filed a complaint in superior court alleging that Fire Lake breached the lease, tortiously interfered with a prospective business relationship, and breached the implied covenant of good faith and fair dealing. Fire Lake counterclaimed for breach of contract and breach of the implied covenant of good faith and fair dealing.

The parties filed three motions for summary judgment: (1) Fire Lake's motion on all of Kimp's claims; (2) Kimp's cross-motion on his claims; and (3) Fire Lake's motion for partial summary judgment on its counterclaim that Quake breached

the lease.  The superior court granted summary judgment in favor of Fire Lake on both of its motions and denied Kimp's motion.

Kimp filed a motion to set aside summary judgment based on newly discovered text messages between himself and Cantrell purporting to show that the parties intended a ten-day cure period for failure to pay rent.  The superior court denied the motion.

Fire Lake sought entry of final judgment and damages limited to its breach of contract claim, effectively waiving any other damage claims that might require trial. Kimp opposed, claiming that Fire Lake was unjustly enriched by "over $200,000" due to improvements he made to the unit.  Before the superior court issued its order for final judgment, Kimp also requested a hearing on an earlier motion he filed to compel discovery.  The court denied the motion for a hearing, and entered final judgment for $221,980.24 in damages the same day.  Kimp appeals.

## III.   STANDARDS OF REVIEW

"We review grants of summary judgment de novo."[1] "It is well-settled that leases are contracts and should be interpreted according to contract principles."[2] "Contract interpretation is a question of law subject to de novo review.  When applying the de novo standard of review, we apply our 'independent judgment to questions of law, adopting the rule of law most persuasive in light of precedent, reason, and policy.' "[3]

---

[1]     *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 516 (Alaska 2014).

[2]     *Rockstad v. Glob. Fin. & Inv. Co.*, 41 P.3d 583, 586 (Alaska 2002).

[3]     *Hahn v. GEICO Choice Ins. Co.*, 420 P.3d 1160, 1166 (Alaska 2018) (quoting *ConocoPhillips Alaska, Inc. v. Williams Alaska Petroleum, Inc.*, 322 P.3d 114, 122 (Alaska 2014)).

"We review the superior court's procedural decisions for abuse of discretion."[4] Finally, "[the superior] court's determination of damages is a finding of fact which we affirm unless it is clearly erroneous. But we apply our independent judgment in deciding whether the [superior] court's award of damages is based on an erroneous application of law."[5]

## IV.    DISCUSSION

Kimp makes four challenges to the superior court's rulings: first, that the superior court's grant of summary judgment against Kimp for breach of contract was improper; second, that it was error for the superior court to rule in Fire Lake's favor on Kimp's claims; third, that the superior court abused its discretion when it denied Kimp's motion for a hearing to compel discovery; and fourth, that the superior court erred in its award of damages. We discuss each of these issues below.

### A.    The Superior Court Properly Granted Summary Judgment In Favor Of Fire Lake On Its Breach Of Contract Claim Against Kimp.

When the moving party seeks summary judgment on an issue where it bears the burden of proof at trial, it must set forth undisputed material facts establishing that it "is entitled to judgment as a matter of law."[6] When the moving party seeks summary judgment on an issue where the non-moving party bears the burden of proof at trial, the moving party must "show[] that there is an absence of a factual dispute on a material fact

---

   [4]      *Norris v. Norris*, 345 P.3d 924, 928 (Alaska 2015).

   [5]      *Beaux v. Jacob*, 30 P.3d 90, 97 (Alaska 2001) (footnote omitted).

   [6]      Alaska R. Civ. P. 56(c); *see also Christensen*, 335 P.3d at 517; *Kalenka v. Jadon, Inc.*, 305 P.3d 346, 350 (Alaska 2013).

and that this absence of a dispute constitutes a failure of proof on an essential element" of the non-moving party's underlying claim.[7]

Fire Lake moved for summary judgment on its counterclaim for breach of contract against Kimp. To prevail on summary judgment, Fire Lake was required to show undisputed facts establishing that Kimp breached the contract.[8] On appeal, Kimp disputes the parties' intent regarding the remedies available to Fire Lake for failure to pay rent and thus claims the issue is inappropriate for resolution on summary judgment. He also claims that Fire Lake's alleged promise to abate his rent until he opened for business should prevent enforcement of the contract under a promissory estoppel theory. To succeed on summary judgment Fire Lake, as the moving party, must also show undisputed facts that establish a failure of proof of an essential element of Kimp's promissory estoppel claim.[9]

**1.      The parties did not intend a cure period for failure to pay rent.**

Kimp asserts that language in Fire Lake's notice of default combined with the text messages he presented in his motion to set aside summary judgment show that the parties intended a ten-day cure period for failure to pay rent. He argues that the parties' disagreement over this issue constitutes a genuine issue of material fact sufficient to overcome Fire Lake's motion for summary judgment.

---

[7]      *Achman v. State*, 323 P.3d 1123, 1126 (Alaska 2014) (quoting *Greywolf v. Carroll*, 151 P.3d 1234, 1241 (Alaska 2007)).

[8]      *See* Alaska R. Civ. P. 56(c); *Christensen*, 335 P.3d at 517.

[9]      *See Achman*, 323 P.3d at 1126.

-8-                                                        **7507**

We have repeatedly stated that "[t]he goal of contractual interpretation is to give effect to the reasonable expectation of the parties."[10] In giving effect to those expectations, we generally decide the meaning of contractual language as a matter of law.[11] We give primary effect to the language of the contract but also consider extrinsic evidence of "the parties' intent at the time the contract was made."[12] When the parties assert a different intended meaning for contractual language, we first determine, as a matter of law, whether the contractual language "is reasonably susceptible to both asserted meanings."[13] Only when both readings are reasonable does the parties' intent become a question of fact sufficient to overcome a motion for summary judgment.[14]

---

[10] *Casey v. Semco Energy, Inc.*, 92 P.3d 379, 383 (Alaska 2004); *accord Sw. Marine, Inc. v. State, Dep't of Transp. & Pub. Facilities, Div. of Alaska Marine Highway Sys.*, 941 P.2d 166, 173 (Alaska 1997); *Norton v. Herron*, 677 P.2d 877, 879-80 (Alaska 1984).

[11] *Alaska Diversified Contractors, Inc. v. Lower Kuskokwim Sch. Dist.*, 778 P.2d 581, 584 (Alaska 1989) ("[Q]uestions of interpretation of the meaning of written documents are treated as questions of law for the court except where they are dependent for their resolution on conflicting extrinsic evidence.").

[12] *Norton*, 677 P.2d at 880; *see also Alaska Diversified Contractors*, 778 P.2d at 584 ("[T]he words of an integrated agreement remain the most important evidence of intention." (quoting RESTATEMENT (SECOND) OF CONTRACTS § 212 cmt. b (AM. LAW INST. 1981)).

[13] *Alaska Diversified Contractors*, 778 P.2d at 584.

[14] *See W. Pioneer, Inc. v. Harbor Enters., Inc.*, 818 P.2d 654, 657 n.4 (Alaska 1991) ("Even where there is conflicting extrinsic evidence the court decides the question of meaning except where the written language, when read in context with its subject matter, is reasonably susceptible to both asserted meanings. If the language is susceptible to both asserted meanings, then interpreting the contract is a question of fact for the jury." (citation omitted)); *Alaska Diversified Contractors*, 778 P.2d at 584 ("The question of the meaning of a written contract, including a review of the extrinsic
(continued...)

In *Rockstad v. Global Finance & Investment Co.*[15] we described a similar framework for lease interpretation. We first determine if language in the lease, when viewed together with extrinsic evidence, is ambiguous.[16] "Disagreement alone does not establish the existence of an ambiguity. . . . '[A]n ambiguity exists only where the disputed terms are reasonably subject to differing interpretation after viewing the contract as a whole and the extrinsic evidence surrounding the disputed terms.' "[17] And we keep to the four corners of the lease when the lease is unambiguous.[18]

Kimp's contention that Quake and Fire Lake never intended failure to pay rent as grounds for immediate default does not withstand scrutiny. The text messages he offers as proof are from November 2016, almost nine months after the lease period began. But that evidence cannot speak to the parties' intent when they signed the lease. Likewise, language in Fire Lake's notice of default references section 17.B, which concerns non-monetary violations of the lease. That language does not speak to the parties' intent with respect to section 17.A, which covers failure to pay rent.

---

[14]     (...continued)
evidence to determine whether any of the extrinsic evidence is conflicting, is a preliminary question for the court. Where there is conflicting extrinsic evidence the court, rather than the jury, must nonetheless decide the question of meaning except where the written language, read in context, is reasonably susceptible to both asserted meanings.").

[15]     41 P.3d 583 (Alaska 2002).

[16]     *Id.* at 586.

[17]     *Id.* (quoting *Wessells v. State, Dep't of Highways*, 562 P.2d 1042, 1046 (Alaska 1977)).

[18]     *See id.*

Section 3.B of the lease makes it clear when rent is due: "[Kimp] shall pay to [Fire Lake] monthly rent . . . , without deductions, prior notice, or demand, . . . on or before the first day of each calendar month." Section 17.A states that "failure to make payment of any installment of monthly rent . . . if not paid by the due date" is grounds for "material default under [the] Lease, thereby entitling [Fire Lake] to exercise any and all of its remedies." These lease provisions are not reasonably susceptible to more than one intended meaning as a matter of law. Rent was due on the first of the month, and failure to make timely payment was grounds for immediate default, entitling Fire Lake to exercise any and all remedies available to it under the lease.

### 2. Kimp's defense of promissory estoppel is without merit.

"The doctrine of promissory estoppel allows the enforcement of contract-like promises despite a technical defect or defense that would otherwise make the promise unenforceable."[19] We have held that to enforce a promise under this doctrine a claimant must establish that an actual promise induced a reasonably foreseeable, substantial change in position and that enforcement must be necessary in the interest of justice.[20]

Kimp argues that Fire Lake's alleged promise to abate his rent induced him to substantially change his position, apparently in that he was free to skip rent payments until he completed construction.[21] He asserts that Fire Lake actually foresaw this change since, after consenting to Kimp's non-payment of rent, it actively helped Quake to secure

---

[19] *Thomas v. Archer*, 384 P.3d 791, 798 (Alaska 2016) (quoting *Kiernan v. Creech*, 268 P.3d 312, 315 (Alaska 2012)).

[20] *Id.* at 798-99.

[21] Kimp stated that his original position was to begin paying rent in September in accordance with the lease.

investors and contractors to finish construction. Fire Lake responds that Kimp's alleged change in position was not action but rather inaction, and that inaction cannot be considered a substantial change in position.

We agree that Kimp's non-payment of rent did not constitute a substantial change in position. In *Zeman v. Lufthansa German Airlines* we considered a dispute over an alleged oral agreement between the builder of an apartment complex and the airline.[22] The parties had preliminary discussions about housing the airline's personnel in Anchorage at an apartment complex the builder was constructing.[23] The airline sent the builder a letter of intent, stating that it planned to house its crews at the builder's apartment complex but could not commit to signing an agreement until it had more confidence that the building would be completed on time.[24] The discussions later fell through, and the airline declined to sign a lease with the builder.[25] The builder sued, claiming the parties had entered into an oral agreement for the airline to lease units from the builder.[26] The builder alternatively argued under a promissory estoppel theory that the airline had promised to enter into a lease agreement with the builder and that the builder detrimentally relied on this promise.[27] We considered the first prong of the promissory estoppel test: whether the action induced by the airline's alleged promise

---

[22]     699 P.2d 1274, 1278 (Alaska 1985).

[23]     *Id.* at 1278-79.

[24]     *Id.* at 1278.

[25]     *Id.* at 1279.

[26]     *Id.*

[27]     *Id.* at 1283-84.

amounted to a substantial change of position.[28]  We observed that "[c]ourts look for evidence of actual and substantial economic loss" to determine "[w]hether particular actions represent substantial changes."[29]

In *Zeman* we remanded for the superior court to make findings as to whether actual and substantial economic loss occurred.[30]  Here, remand is not necessary. The action allegedly induced by the promise to abate rent was for Kimp to forgo financial outlays he otherwise would have been required to make.  Kimp claims this is a substantial change in position.  But this is not actual and substantial economic loss.  On the contrary, it is a financial windfall for Kimp.  While it is a change in position, it is a change in the wrong direction, and it therefore cannot serve as a basis for Kimp's promissory estoppel claim.

Kimp asserts that Fire Lake's alleged promise induced him to refrain from paying rent.  But Kimp's non-payment of rent does not constitute a substantial change. Thus, there is "an absence of a factual dispute on a material fact."[31] Summary judgment against Kimp on his promissory estoppel defense was proper.

### 3.     Fire Lake met its summary judgment burden to show that Kimp breached the lease.

Fire Lake provided undisputed evidence showing that Kimp materially breached the lease when he did not pay Fire Lake rent when due.  This was grounds for immediate default and material breach of the lease under section 17.A.  We therefore

---

[28]     *Id.* at 1284-85.

[29]     *Id.* at 1284.

[30]     *Id.* at 1285.

[31]     *Achman v. State*, 323 P.3d 1123, 1126 (Alaska 2014) (quoting *Greywolf v. Carroll*, 151 P.3d 1234, 1241 (Alaska 2007)).

affirm the superior court's grant of summary judgment in favor of Fire Lake for breach of contract.

**B.    The Superior Court Properly Granted Summary Judgment In Favor Of Fire Lake On All Of Kimp's Claims.**

Fire Lake may succeed on summary judgment on Kimp's claims against it if undisputed facts establish that it is entitled to dismissal of Kimp's claims as a matter of law.[32]  We conclude as a matter of law that Fire Lake did not breach the lease as Kimp claims.  Fire Lake also did not act with the intent required for intentional interference with a prospective business relationship.  And it did not injure the rights Kimp bargained for under the lease as required for breach of the implied covenant of good faith and fair dealing.  The superior court therefore properly granted summary judgment dismissing all of Kimp's claims against Fire Lake.

**1.    Fire Lake did not breach the lease.**

Kimp argues that Fire Lake violated lease sections 13, 17.B, 18.C, and 18.D.[33]  Section 13 provides Fire Lake with a general release from liability for damage to Quake or Quake's property except from activity arising out of gross negligence or willful misconduct.  Kimp argued that Fire Lake acted in a grossly negligent manner

---

[32]    *See* Alaska R. Civ. P. 56(c).

[33]    Section 13 concerns Fire Lake's liability for damage to Quake or Quake's property.  Section 17.B gives Quake ten days after receiving notice to cure certain types of default.  Section 18 governs remedies:  upon termination of the lease, section 18.C gives Fire Lake a right to repossess the unit while section 18.D allows Fire Lake to seize Quake's personal property.  Kimp also argued that Fire Lake breached section 15.B in his motion papers before the superior court.  But on appeal he does not mention this section except once in passing with no additional follow-up.  We therefore deem this argument waived for inadequate briefing and do not address it. *Windel v. Carnahan*, 379 P.3d 971, 980 (Alaska 2016) ("[W]here a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal." (quoting *Burts v. Burts*, 266 P.3d 337, 344 (Alaska 2011))).

when it declined to approve his plans for live music. We believe Kimp implies that Fire Lake breached section 13 when it acted in this manner.

We struggle to understand, however, how Fire Lake could breach this section of the lease at all. Section 13 states: "[Fire Lake] shall not be liable to [Quake] for any damage to [Quake] or [Quake]'s property from any cause, and [Quake] further waives all claims against [Fire Lake] for . . . damage to any property . . . for any reason." It further requires Quake to indemnify Fire Lake and hold it harmless for any injury that arises out of Quake's business. Section 13 provides an exception to this liability waiver and indemnification requirement in the event Fire Lake engages in grossly negligent or willful misconduct, but it fundamentally does not require Fire Lake to do anything. Section 13 rather limits Fire Lake's obligations under the lease and imposes an additional obligation on Quake to indemnify Fire Lake under certain circumstances.

"[A] breach of contract is a failure, without legal excuse, to perform any promise that forms the whole or part of a contract."[34] There is nothing Fire Lake can do to breach this section of the lease because it does not contain a promise Fire Lake made to Quake. Even assuming that Fire Lake acted in a grossly negligent or willful manner and that this action caused Quake injury, section 13 would only allow Quake to bring an action for negligence against Fire Lake, not one for breach of contract. But Kimp does not include negligence as a cause of action in his complaint. Fire Lake did not breach section 13 because it could not commit breach of this section in the manner that Kimp describes.

Section 17 contains provisions related to default. This section outlines five conditions under which Quake could default under the lease. Each of these conditions

---

[34] 23 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 63:1, at 478 (4th ed. 2018).

gives Fire Lake the right to exercise the remedies outlined in section 18. Kimp argues that Fire Lake breached section 17.B by not giving him notice and ten days to cure his failure to pay rent. But we have already concluded that failure to pay rent when due was grounds for immediate default under section 17.A. The plain language of the lease does not require Fire Lake to give Kimp notice before exercising remedies for his lack of rent payment. Fire Lake did not breach the notice-and-cure-period provisions of section 17.B because it exercised remedies available to it under the authority of section 17.A.

Kimp claims that our decision in *Sengul v. CMS Franklin, Inc.*[35] requires us to conclude that Fire Lake breached sections 18.C and 18.D when it locked him out of the unit and constructively evicted him without first terminating the lease. In *Sengul* we considered whether a landlord violated the lease when he placed a cable lock on the door preventing the tenant from accessing the rental unit for a couple of hours.[36] But our conclusion in that case rested on express language in the lease: the lease allowed landlord self-help only upon notice, and because the landlord did not give notice prior to locking the tenant out, he violated the lease.[37] *Sengul* illustrates the case-by-case nature of the inquiry we must perform in these cases. We must examine the terms of the lease in these situations to determine the legality of the landlord's action.

The lease provisions in this case are clear: a default by Quake as outlined in section 17 triggers the remedies detailed in section 18. Unlike the lease we considered in *Sengul*, section 17.A did not require notice before Fire Lake could exercise remedies for failure to pay rent. Once Kimp defaulted, Fire Lake had an immediate right to enter and relet the unit under section 18.A.

---

[35]     265 P.3d 320 (Alaska 2011).

[36]     *Id.* at 323.

[37]     *Id.* at 324-25.

Fire Lake could not have done so without some amount of disruption to Kimp's possession.  Fire Lake submitted evidence that it had concerns over "major safety issues [that] . . . Kimp failed to address."  This included a dysfunctional fire suppression and sprinkler system and other building code violations.  Once Fire Lake entered the unit, it discovered that Kimp may have caused damage to the roof and voided Fire Lake's roof warranty.

Fire Lake could not have accomplished the tasks required to relet the unit without also putting in place some mechanism to prevent Kimp from interfering with that effort and causing more damage.  Fire Lake's actions here, unlike those in *Sengul*, were expressly allowed under the lease.[38]

### 2. Undisputed facts establish that Fire Lake did not intend to interfere with Quake's business relationship.

Kimp claims that the superior court erred by omitting his claim of intentional interference with a prospective business relationship altogether.  But the superior court did not omit this claim from its analysis.  The superior court first identified the six elements a plaintiff must show for the tort of intentional interference with a

---

[38]  Kimp argued extensively in his motion papers that Fire Lake violated numerous statutes related to forcible entry and detainer.  But he appears to have abandoned all of these arguments on appeal.  We therefore do not consider them. *Windel*, 379 P.3d at 980.  We note only that the forcible entry and detainer statutes do not preclude landlord self-help in commercial leases. *See Sengul*, 265 P.3d at 324-25*; Klosterman v. Hickel Inv. Co.*, 821 P.2d 118, 122 (Alaska 1991).

prospective business relationship.[39] It then concluded that Kimp had not established intent as required by the second element of the tort, and indeed he has not.

Nowhere in his motion papers did Kimp provide evidence that in retaking possession of the unit, Fire Lake did so with intent to interfere with a prospective relationship. Kimp submitted an affidavit stating that Cantrell had knowledge of his relationship with the company that agreed to help him finish construction, but he never alleged that Fire Lake evicted him with intent to interfere with that relationship.

In contrast, Fire Lake submitted evidence showing that it did not intend to interfere with Kimp's business relationship. Fire Lake had concerns that Kimp's "multiple material breaches, many that involved serious safety issues, . . . could jeopardize the financial viability of Fire Lake Plaza and potentially cause it to file for bankruptcy." Kimp did not dispute these facts. Undisputed facts therefore show a

---

[39] A plaintiff must establish all of the following to prevail on a claim of intentional interference with prospective business or contractual relations:

1.  A prospective business relationship must exist;
2.  The defendant must know of the prospective relationship and intend to prevent its fruition;
3.  The prospective business relationship must not culminate in pecuniary benefit to the plaintiff;
4.  The defendant's conduct must interfere with the prospective relationship;
5.  The interference must cause the plaintiff damages; and
6.  The defendant's conduct must not be privileged or justified.

*See Oaksmith v. Brusich*, 774 P.2d 191, 198 (Alaska 1989).

failure to establish an essential element of Kimp's claim. The superior court did not err by granting summary judgment in favor of Fire Lake on that claim.[40]

### 3. Fire Lake did not injure Kimp's rights under the lease as required for breach of the implied covenant of good faith and fair dealing.

"Under Alaska law, every contract has an implied covenant of good faith and fair dealing requiring 'that neither party . . . do anything which will injure the right of the other to receive the benefits of the agreement.' "[41] The covenant arises out of "an effort to further the expectations of the contracting parties that . . . promises will be executed in good faith."[42] We have held that "bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty."[43]

Kimp claims that Fire Lake violated the implied covenant of good faith and fair dealing in two ways. First, he contends that Fire Lake prevented Quake from fulfilling its obligations under the lease when Fire Lake delayed making lease modifications as required by Quake's special land use permit. Second, he argues that Fire Lake prevented Quake from completing its construction work on time because of its delays in approving the water shutoff.[44]

---

[40]    *See Achman v. State*, 323 P.3d 1123, 1126 (Alaska 2014).

[41]    *Castle Props., Inc. v. Wasilla Lake Church of the Nazarene*, 347 P.3d 990, 997 (Alaska 2015) (alteration in original) (footnote omitted) (quoting *Jackson v. Am. Equity Ins. Co.*, 90 P.3d 136, 142 (Alaska 2004)).

[42]    *Alaska Pac. Assurance Co. v. Collins*, 794 P.2d 936, 947 (Alaska 1990).

[43]    *Klondike Indus. Corp. v. Gibson*, 741 P.2d 1161, 1168 (Alaska 1987) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. d (AM. LAW INST. 1981)).

[44]    Kimp alleged in his amended complaint that Fire Lake's refusal to put its promise to abate rent in writing also constituted breach of the implied covenant of good
(continued...)

We hold that neither of Kimp's claims constitutes breach of the implied covenant. Even if we assume that Fire Lake's delays in making lease modifications thwarted Quake's ability to operate under its special land use permit, Quake did not bargain for an agreement where Fire Lake was required to allow an entertainment venue within the brewpub. The lease clearly states that noise emitted from loud speakers or other devices should not be heard outside of the unit. Quake's special land use permit application states that only recorded music, and no live music, would be played within the brewpub. When Kimp first discussed with Cantrell her concerns about his plans for a stage, he implied that he did not need to build the stage at all if she had a problem with it. Despite those assurances, Kimp faults Cantrell for her refusal to allow the "types of live music and live entertainment that would be typical at [his] brewpub."

Kimp claims that before Quake could open for business under the permit, Fire Lake had to approve lease modifications to allow noise to be heard outside of the premises and to allow entertainment and amplified events. But these modifications were only required because of information Kimp included in his permit application to establish an entertainment venue there. Kimp did not have to submit plans that called for these types of lease changes, and based on the plain language of the lease, he certainly did not bargain for them. Cantrell's refusal to permit them therefore could not frustrate the benefit that Quake bargained for when entering into the lease with Fire Lake, and such action cannot be considered a basis for breach of the implied covenant.

---

**44** (...continued)
faith and fair dealing. But he mentions this incident on appeal only in the context of promissory estoppel. We decline therefore to address Fire Lake's alleged promise to abate rent in our analysis of breach of the implied covenant of good faith and fair dealing.

Likewise the evidence does not show that Fire Lake breached the implied covenant with respect to shutting off water to the unit. We have recognized that inaction can provide a basis for breach of the implied covenant.[45] But we have also noted that a party's action or inaction should be viewed through a lense of reasonableness.[46] The evidence Kimp submitted shows that Fire Lake made reasonable efforts to accommodate Kimp in coordinating the water shutoff. It was reasonable that Fire Lake would attempt to shut off the water in a way that would minimize disruption to its other tenants. And Fire Lake's property management company responded to Kimp's requests in a reasonable amount of time. The property management company attempted to contact Kimp on multiple occasions in late April to coordinate a time that would work for everyone. When the projected shutoff moved from April to May, the property management company again contacted Kimp because it apparently had not heard from him. The next correspondence in the record is from late May when Kimp indicated that his plumber needed to shut the water off in early June; the property management company responded to Kimp within two business days. This evidence demonstrates that Fire Lake made reasonable efforts through its property management company to coordinate with Kimp in good faith on shutting water off to the unit. Kimp adduced no evidence raising a genuine issue of fact as to breach of the implied covenant.

---

[45]     *See Klondike*, 741 P.2d at 1168.

[46]     *See Castle Props.*, 347 P.3d at 998 n.29 ("The implied covenant of good faith and fair dealing requires not only subjective good faith, but also that both parties 'act in a way that a reasonable person would consider fair.' " (quoting *Hawken Nw., Inc. v. State, Dep't of Admin.*, 76 P.3d 371, 381 (Alaska 2003))).

**C.**  **The Superior Court Did Not Abuse Its Discretion By Denying Kimp's Request For A Hearing On His Motion To Compel Discovery.**

Kimp argues the superior court erred in denying his request for a hearing on his motion to compel discovery because Alaska Civil Rule 77(e)(2) explicitly "allow[s] for such a hearing." But Rule 77(e)(2) does not require the superior court to hold this hearing; it gives the superior court discretion whether to hold a hearing.[47] Kimp presents nothing to suggest that the superior court's order denying his request was an abuse of discretion. Given that the superior court had already granted summary judgment and was prepared to enter final judgment in Fire Lake's favor, it was entirely reasonable for the court to deny Kimp's subsequent discovery motion that might prolong entry of final judgment.

**D.**  **The Superior Court Did Not Clearly Err In Its Award Of Damages.**

Kimp argues that the superior court erroneously overlooked his claim that Fire Lake was unjustly enriched and that the court's award of damages was excessive. We conclude that the superior court did not clearly err with respect to the damages award.

Kimp asserts that he enriched Fire Lake by over $200,000, including over $20,000 he paid for engineering floor plans that Fire Lake allegedly used without compensation. But even assuming that Kimp paid every bill or invoice he received, Kimp does not explain how Fire Lake was unjustly enriched by those payments. For example, Fire Lake would not have been enriched by Kimp's payments to the Municipality of Anchorage for permits. Nor does he present any evidence showing that Fire Lake or any subsequent tenant kept or used any of the items he allegedly paid for

---

[47]  *See* Alaska R. Civ. P. 77(e)(2) (stating that "oral argument shall be held only in the discretion of the judge" except for dispositive and certain property-related motions).

and left in the unit. On the contrary, Kimp acknowledges in his briefing on appeal that he retrieved his property from the unit.

Finally, Kimp argues that Fire Lake improperly appropriated his architectural drawings, but Kimp's evidence does not establish what he paid for those drawings. The superior court did not clearly err in finding that Fire Lake was not unjustly enriched.

As for the damages award, Kimp argues that the superior court violated Alaska Civil Rule 52(a) by not explaining how it arrived at the damages award.[48] But Fire Lake submitted an affidavit that clearly detailed its request for damages. These damages included $157,664.11 in unpaid rent and utilities; late fees on the unpaid rent totaling $15,168.90; a $20,000 settlement with a contractor that Kimp never paid; $2,525.98 for repairs to the unit and cleanup costs; and $26,621.25 for the broker's commission paid by Fire Lake. The superior court's award of damages exactly matches Fire Lake's request. And while Kimp asserted that Fire Lake was unjustly enriched, he did not dispute that he owed Fire Lake for each of these items. We thus find ample evidence in the record to support the court's damages award, and we conclude the court did not clearly err in making its award.[49]

---

[48]    *See* Alaska R. Civ. P. 52(a) ("In all actions tried upon the facts without a jury . . . , the court shall find the facts specially and state separately its conclusions of law thereon . . . .").

[49]    Kimp also argues the superior court's award of attorney's fees to Fire Lake was excessive. This argument is waived because Kimp fails to explain why the court's award was erroneous and he fails to cite any authority to support his argument.

## V. CONCLUSION

We AFFIRM the superior court's grant of summary judgment in favor of Fire Lake. We AFFIRM the superior court's order denying Kimp's request for a hearing on his motion to compel. And we AFFIRM the superior court's award of damages.